2014 UT App 26

**Elaine J. KIDD, Petitioner and Appellee,**

v.

**Clark Bruce KIDD, Respondent
and Appellant.**

No. 20120460–CA.

Court of Appeals of Utah.

Jan. 30, 2014.

Rehearing Denied April 7, 2014.

202

Raymond N. Malouf, Logan, Attorney for Appellant.

Lyle W. Hillyard, Logan, Attorney for Appellee.

Judge STEPHEN L. ROTH authored this Opinion, in which Judges GREGORY K. ORME and CAROLYN B. McHUGH concurred.

## Opinion

ROTH, Judge:

¶ 1 Clark Bruce Kidd (Husband) appeals from several orders of the trial court related to the dissolution of his marriage to Elaine J. Kidd (Wife). We affirm.

## BACKGROUND [1]

¶ 2 Husband and Wife married on March 13, 1980, and divorced on March 9, 2012, after thirty-two years of marriage. Although the parties were able to agree on most of the terms of their divorce, they could not resolve four issues that are now the subject of this appeal: alimony; Husband's demand that as a condition of receiving certain personal assets, Wife pay him the $4,505 she had with-

drawn from a joint account; distribution of a thrift savings plan (TSP) account; [2] and removal of Wife's name from the mortgage on the marital home. After a bench trial on November 18, 2011, the trial court entered findings of fact and conclusions of law in a memorandum decision.

## I. Alimony

¶ 3 At the time of the trial, Husband, who was fifty-six, earned a gross monthly income of $5,925. He also collected another $2,324 per month from pensions and rental income and had approximately $87,000 in savings. Wife, age fifty-five, was then unemployed, but she had worked at a Wal–Mart pharmacy between 2006 and 2010 for approximately thirty-five hours per week at $9.80 per hour. The trial court heard evidence that Wife had, at some time in the past, partially completed the coursework for a college degree but that she had experienced difficulty in maintaining employment due to depression. For purposes of its alimony determination, the court imputed to Wife a salary of $9 per hour or $1,560 per month. The court accepted both parties' estimates of their respective monthly expenses, which amounted to $7,270 for Husband, including income taxes and other deductions, and $6,078 for Wife.[3] The parties' combined expenses were approximately $3,500 more than their combined income. Because Husband was receiving from employment, retirement, and rental income $979 more than his monthly expenses and Wife considerably less than hers, the court found it "appropriate to equalize the parties' standards of living" by having Husband "help provide for [Wife's] needs." It therefore awarded Wife monthly alimony in the

---

1. "On appeal from a bench trial, we view the evidence in a light most favorable to the trial court's findings, and therefore recite the facts consistent with that standard." *ProMax Dev. Corp. v. Mattson*, 943 P.2d 247, 250 n. 1 (Utah Ct.App.1997) (citation and internal quotation marks omitted). "However, we present conflicting evidence to the extent necessary to clarify the issues raised on appeal." *Id.* (citation and internal quotation marks omitted).

2. A thrift savings plan is "a defined contribution plan," similar to a 401(k) plan, "for Federal employees and members of the uniformed services." *Purpose and History*, Thrift Savings Plan, http://www.tsp.gov/planparticipation/about/

purposeAndHistory.shtml (last visited January 23, 2014).

3. Husband asserts that Wife's projected monthly expenses contain a mathematical error and actually total $5,728, rather than $6,078. The trial court failed to either seek clarification from Wife or correct its finding, presumably because the $350 discrepancy had no effect on its analysis or its ruling. For that reason, we use the $6,078 figure accepted by the court, while acknowledging that there appears to be a mathematical error in Wife's budget. The discrepancy does not affect our decision.

amount of $2,182.50. The court explained that it arrived at this figure by adding the parties' monthly income only from employment ($5,925 + $1,560 = $7,485), dividing that income in half ($7,485 / 2 = $3,742.50), and subtracting the income imputed to Wife ($1,560). This division left both parties with a monthly shortfall but was intended to ensure that the shortfall in their ability to maintain the marital standard of living was equitably shared. The court made the alimony award retroactive to the time of the separation in October 2010 and awarded Wife $9,555 in back alimony, the difference between the permanent monthly alimony award ($2,182.50) and the temporary monthly alimony amount ($1,500), calculated from October 1, 2010, when temporary alimony began, to December 19, 2011, when permanent alimony was awarded.

## II. Property Division

¶ 4 The parties reached agreement about the division of most of their assets. However, $4,505 that Wife had withdrawn from a marital account remained in dispute, as did interpretation of the provision of their settlement agreement that related to division of Husband's TSP account.

### A. The $4,505 Withdrawal

¶ 5 Shortly after the parties' separation, Wife withdrew $4,505 from a joint bank account primarily used by Husband. Eventually, Wife paid the $4,505 to Husband, although the parties dispute the circumstances that led her to do so.

¶ 6 At trial, Wife testified that when she attempted to pick up personal property from the former marital home, as the parties had earlier agreed she could, Husband prevented her entry, stating, "[Y]ou're not taking anything until we've settled the [$]4,505 that you owe me from my account that you took." Wife testified that she wrote a check on the spot for $4,505 so that she could collect her personal property.

¶ 7 Husband testified, however, that the parties had reached a tentative agreement on how to divide their personal property but renegotiated because Wife wanted some additional property, primarily a piano, that they had yet to divide. According to Husband, the parties reached a new agreement in which Wife agreed to pay the $4,505 in exchange for the piano and some other items. Husband explained that they had settled this payment when they had divided their final joint banking account, which contained $10,788 of equity withdrawn from the marital home. Wife was entitled to half that amount ($5,394), but Husband claims that because she had agreed to pay the $4,505 she had withdrawn from another account, he paid her the difference between her share and the withdrawal, or $899, by check. The trial court resolved this dispute in Wife's favor and "awarded [her] a credit of $4,505.00 as a refund for funds [Husband] obtained from [her] by way of unlawful coercion."

### B. The TSP Account

¶ 8 During the marriage, Husband contributed to a TSP account. Prior to trial, Husband and Wife had executed a settlement agreement, in which they agreed to "evenly divide the TSP savings plan as of March 31, 2011." It appears that the parties intended that these assets be divided in advance of the entry of a final divorce decree, but by the time of trial, no Qualified Domestic Relations Order (QDRO) had been presented to the account administrator to distribute the assets. A dispute had also arisen regarding whether the TSP account was to be divided by assigning shares to Wife or by paying her their cash value. The trial court received evidence on the number of shares in the account and the value of the account as of four separate dates: October 1, 2010, the date that temporary alimony was ordered; March 31, 2011, the date agreed upon in the settlement agreement; April 1, 2011, the date after the one agreed upon in the settlement agreement; and October 28, 2011, just before trial. The number of shares had steadily increased between October 1, 2010, and October 28, 2011, due to Husband's continued contributions to the account after the parties' separation. The value of each share had also increased between October 1, 2010, and April 1, 2011, but by October 28, 2011, the value of each share had decreased. Wife argued that the TSP account could not be

properly allocated by simply dividing the number of shares; rather, she contended, "[y]ou have to figure out the value and then make an award of money that ... offsets that value."

¶ 9 The trial court concluded that the settlement agreement contemplated that the parties would evenly divide the value of the TSP account rather than the shares. It calculated the account's value by multiplying the number of shares on April 1, 2011 (2992.4822 shares) by the value of each share as of October 28, 2011 ($21.1507 per share). The court explained that it used October 28 as the valuation date so as not to penalize Husband for any decrease in share value due to the delay in dividing the account.[4] According to that calculation, the account had a value of $63,293.09, and the court awarded Wife $31,646.55 in accordance with the parties' agreement to "evenly divide the TSP savings plan."

### III. The Mortgage on the Marital Home

¶ 10 Sometime after executing the written settlement agreement, Husband and Wife orally agreed that Husband would buy Wife's interest in the marital home and take action to remove her name from the mortgage loan.[5] In spring 2010, the parties had refinanced the marital home, at which time they withdrew and divided evenly much of the equity from the marital home. In June 2011, Husband paid Wife $1,000 for her share of the small remaining equity and Wife executed a warranty deed transferring her ownership interest in the home to Husband. By the time of trial however, Husband had not yet taken steps to remove Wife's name from the mortgage. The trial court therefore ordered Husband to "take the necessary steps to remove [Wife's] name from the mortgage" by March 18, 2012, ninety days from the entry of the memorandum decision.

### IV. Decree of Divorce

¶ 11 On March 9, 2012, the trial court entered a final decree of divorce, to which it attached copies of the parties' settlement agreement and the court's memorandum decision, both of which were incorporated by reference in the decree. In addition to the issues specifically addressed in the memorandum decision and the findings of fact and conclusions of law, the decree included provisions outlining the QDROs needed to divide Husband's retirement accounts and established the length of the marriage—thirty-two years—as the term for Husband's payment of alimony, with the usual provisions for termination in the event of remarriage, cohabitation, or death.

¶ 12 Husband now appeals.

### ISSUES AND STANDARDS OF REVIEW

¶ 13 Husband challenges the trial court's $2,182.50–per–month alimony award. Specifically, Husband asserts that the court abused its discretion by awarding alimony without an adequate basis for its finding on Wife's needs and by awarding alimony in excess of Wife's needs and Husband's ability to pay. "Alimony determinations will be upheld on appeal unless a clear and prejudicial abuse of discretion is demonstrated." *Mark v. Mark*, 2009 UT App 374, ¶ 6, 223 P.3d 476 (citation and internal quotation marks omitted). In making an award of alimony, the court must "support[ ] its decision with adequate findings and conclusions." *Id.* (citation and internal quotation marks omitted). Those findings must be "sufficiently detailed and include enough subsidiary facts to disclose the steps by which the ultimate conclusion on each factual issue was reached." *Hall v. Hall*, 858 P.2d 1018, 1021 (Utah Ct. App.1993) (citation and internal quotation

---

4. It is not apparent why the court used the number of shares in the TSP account on April 1, 2011, when the parties had stipulated to using the number of shares in the account on March 31, 2011. However, neither party disputes the fact that the number of shares was the same on April 1 as it was on March 31.

5. "Remove Wife's name from the mortgage" appears to have been a shorthand description used by the parties and later adopted by the trial court to refer to an arrangement whereby Wife would be excused from any further responsibility on the loan secured by a mortgage on the marital home after Husband bought out her interest in June 2011. At trial, Husband stated that he intended to fulfill this obligation by refinancing the home as the sole obligor. For consistency and convenience, we use the same language.

marks omitted). "Unstated findings can be implied if it is reasonable to assume that the trial court actually considered the controverted evidence and necessarily made a finding to resolve the controversy, but simply failed to record the factual determination it made." *Id.* at 1025. "We review challenges to findings of fact for clear error" and will reverse only if the findings "are in conflict with the clear weight of the evidence, or if this court has a definite and firm conviction that a mistake has been made." *Henshaw v. Henshaw*, 2012 UT App 56, ¶ 10, 271 P.3d 837 (citation and internal quotation marks omitted). "Consequently, as an appellate court, we give great deference to the trial court and do[ ] not lightly disturb ... [its] factual findings." *Id.* (alterations and omission in original) (citation and internal quotation marks omitted).

¶ 14 Husband also appeals from two property distribution rulings dealing with the repayment of $4,505 and the distribution of the TSP account. "Trial courts have considerable discretion in determining ... property distribution in divorce cases, and will be upheld on appeal unless a clear and prejudicial abuse of discretion is demonstrated." *Stonehocker v. Stonehocker*, 2008 UT App 11, ¶ 8, 176 P.3d 476 (omission in original) (citation and internal quotation marks omitted). To the extent, however, that the trial court's ruling depended on interpretation of the settlement agreement, we defer to it on issues of fact but review its decision on legal questions for correctness. *See Flores v. Earnshaw*, 2009 UT App 90, ¶ 7, 209 P.3d 428 (explaining the standard for reviewing a trial court's determination that a contract was ambiguous); *see also Jacobsen v. Jacobsen*, 2011 UT App 161, ¶ 13, 257 P.3d 478 ("The governing principle in our law is that contracts between spouses are enforceable and generally subject to ordinary contract principles...." (citation and internal quotation marks omitted)).

¶ 15 Husband next takes issue with the trial court's order that he take steps to remove Wife's name from the mortgage on the marital home by March 18, 2012. A trial court's equitable orders should be "accord[ed] substantial deference," with the trial court being given "considerable latitude." *Cf. Connell v. Connell*, 2010 UT App 139, ¶ 34, 233 P.3d 836 (applying this standard to equitable orders on child support).

¶ 16 Husband also challenges the trial court's decision to incorporate the parties' settlement agreement and the memorandum decision by reference in the final decree of divorce. Husband argues that pursuant to Utah Rule of Civil Procedure 54(a), the court should have included findings and conclusions derived from these documents in the decree itself, rather than merely attaching them for reference. We review a court's compliance with the rules of procedure for correctness. *See Arbogast Family Trust v. River Crossings, LLC*, 2010 UT 40, ¶¶ 10, 18, 238 P.3d 1035; *Martinez v. Media–Paymaster Plus/Church of Jesus Christ of Latter-day Saints*, 2007 UT 42, ¶ 46, 164 P.3d 384. To the extent that the rule permits an exercise of discretion, we review the trial court's acts for abuse of that discretion. *Cf. Young v. State*, 2000 UT 91, ¶ 4 & n. 2, 16 P.3d 549 (considering whether the trial court "exceeded the range of discretion" afforded to trial courts in awarding costs (citation and internal quotation marks omitted)).

¶ 17 Finally, Husband contends that the trial court included decisions in the decree that were not addressed in the court's memorandum decision. We interpret this as a contention that the court made rulings in the decree on matters that were not addressed at trial. Whether an issue has been presented to the court so as to permit it to grant relief is an issue of law ordinarily reviewed for correctness. *Combe v. Warren's Family Drive–Inns, Inc.*, 680 P.2d 733, 735–36 (Utah 1984); *Cowley v. Porter*, 2005 UT App 518, ¶ 31, 127 P.3d 1224. However, we resolve Husband's contention on grounds of preservation and inadequate briefing, and as a result, we do not reach its merits.

## ANALYSIS

### I. Alimony

¶ 18 In his challenge to the trial court's award of alimony, Husband raises three claims of error: (1) the trial court failed to

state an adequate basis to support a finding that Wife had a need for alimony and thus erred in its attempt to equalize the parties' standards of living; (2) the alimony award "ignore[s Husband's] obligation to pay taxes, and [the] costs and inconvenience to earn [his] salary" and also exceeds both Wife's needs and Husband's ability to pay; and (3) the court should not have ordered Husband to pay alimony retroactively because "[d]uring those months, the expenses she lists were not incurred." We first address Husband's two contentions that challenge the prospective alimony award.

### A. Husband Has Not Demonstrated Error in the Alimony Award.

¶ 19 Husband argues that "[t]he trial court did not find facts that [Wife] has the present need for alimony awarded," essentially because the court did not limit its assessment of Wife's need to the expenses she was actually incurring at the time of trial. Husband also contends that the court failed to accurately assess Husband's own ability to pay in making the award. A request for alimony requires that the trial court consider "the financial condition and needs of the recipient spouse," "the recipient's earning capacity or ability to produce income," "the ability of the payor spouse to provide support," and "the length of the marriage."[6] Utah Code Ann. § 30-3-5(8)(a) (LexisNexis Supp.2013).[7] "Findings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses." Utah R. Civ. P. 52(a). A finding is clearly erroneous only if it is "in conflict with the clear weight of the evidence." *Kimball v. Kimball*, 2009 UT App 233, ¶ 14, 217 P.3d 733. Because the trial court's findings regarding alimony appear to be supported by the evidence, we decline to disturb the alimony award.

### 1. The Trial Court Appropriately Based Its Alimony Award on Wife's Projected Needs.

¶ 20 Husband complains that the trial court based its alimony determination on Wife's projected monthly expenses of $6,078 rather than on the much lower expenses she was actually incurring at the time of trial. Husband asserts that the court erred in using those projected expenses to equalize the parties' standards of living without taking into consideration the parties' actual needs and Husband's ability to pay.

¶ 21 At trial, Wife testified that she was then living with a family member but that she intended to purchase her own home as soon as the divorce was finalized. Wife explained that she had become accustomed to living in her own home during the marriage and was only living with family until she qualified for a mortgage loan, which depended on the final division of the parties' assets and determination of any alimony award. Accordingly, she presented a financial declaration that included both her then-current monthly expenses ($3,698) and the higher monthly expenses she anticipated once she moved into her own home ($6,078). Wife's expense projection included a mortgage payment of $1,100 (including principal, interest, taxes, and insurance, based on a listing for a four-bedroom home at $170,500) and $550 in additional household expenses that she would incur once she was on her own again. Based on this testimony, the trial court found that Wife "currently lives with a relative and is searching for a home. Once she finds a home she will have $6,078.00 in monthly expenses." Having imputed $1,560 in income to Wife, the court concluded that she was left with a $4,518 deficit between her needs and her ability to earn.

¶ 22 Husband contends that the court's findings do not explain why the court accepted Wife's projected monthly expenses of $6,078 when both Wife's then-current actual monthly expenses and the monthly expenses that Husband himself projected for Wife to-

---

**6.** The other statutory alimony factors are not applicable here. *See* Utah Code Ann. § 30-3-5(8)(a) (LexisNexis Supp.2013).

**7.** This subsection of the Utah Code has not been amended since the entry of the divorce decree. We therefore cite the current codification as a convenience to the reader.

taled less than $4,000.[8] He also contends that the court abused its discretion in using those projected expenses to equalize the parties' standards of living because Wife's actual expenses demonstrated that she did not need alimony. *See Sellers v. Sellers,* 2010 UT App 393, ¶ 3, 246 P.3d 173 (explaining that unless the party seeking alimony has insufficient income to meet her needs, a court abuses its discretion in further analyzing the alimony factors and in making any attempt to equalize the income).

¶ 23 The trial court, however, explained in its memorandum decision why it accepted Wife's projected expenses as her reasonable needs: "[She] is searching for a home. Once she finds a home, she will have $6,078 in monthly expenses." The court also recognized that it had imputed only $1,560 per month in income to her. On the other hand, the court found that Husband received $8,249 per month in salary, retirement, and rental income, and it also accepted Husband's declared monthly expenses of $7,270 without making any deductions, just as it had for Wife. The court therefore concluded that because Husband brought in more than he spent and Wife had more expenses than income, Husband "has the capacity to earn sufficient for his needs and to help provide for [Wife]'s needs." However, because the parties' joint expenses exceeded their joint incomes, the trial court found it "appropriate to equalize the parties' standards of living." *See id.* ("[T]he courts will equalize the incomes of the parties ... in those situations in which one party does not earn enough to cover his or her demonstrated needs and the other party does not have the ability to pay enough to cover those needs."). And the

court did so by adding "[Wife]'s imputed income ($1560) ... to [Husband's] salary ($5925) divided in half" and then subtracting Wife's imputed income. This calculation, which excluded Husband's additional pension and rental income of $2,324, left Wife with a $2,335.50 monthly shortfall, while Husband's was $1,203.50.[9]

¶ 24 Husband nevertheless insists that Wife's projected $6,078 monthly need was "speculative and wishful" because both her actual needs and the more modest budget he prepared for her demonstrated that her monthly expenses were under $4,000. As the trial court found, however, Wife's lower expenses at the time of trial were largely due to the separation, which caused her to temporarily move in with a relative and live in circumstances significantly more straitened than during the marriage.[10] Indeed, we have previously instructed trial courts to avoid focusing on "actual expenses alone" when assessing need because the expense level during separation "may be necessarily lower than needed to maintain an appropriate standard of living for various reasons, including, possibly, lack of income." *Howell v. Howell,* 806 P.2d 1209, 1212 (Utah Ct.App.1991). Rather, the trial court generally should "consider[ ] the standard of living 'during the marriage.'" *Id.; see also Bingham v. Bingham,* 872 P.2d 1065, 1068 (Utah Ct.App.1994) (considering the wife's *estimated* future expenses in determining whether the alimony award was appropriate). And although Wife's monthly budget includes a payment of $800 in attorney fees toward a balance of just under $15,000, we also reject Husband's claim that the alimony award results in his

8. Husband did not present a projected budget for Wife at trial. After trial, however, Husband objected to the court's findings regarding alimony based on his claim that Wife's proposed budget had "obvious math and logic errors." Husband attached a recalculated budget to his objection, which calculated Wife's monthly expenses at $3,205, nearly $500 less than Wife's then-current actual monthly expenses.

9. Husband asserts that the court failed to consider Wife's $1,514 share of two retirement accounts, which should have been considered in calculating need. Husband does not say whether Wife is currently eligible to receive this money nor does he direct us to any point in the record

where this information was provided to the trial court. As a consequence, we do not further consider this argument. *See* Utah R.App. P. 24(a)(5)(A) (requiring an appellant to provide citation to the place in the record where the issue was preserved in the trial court).

10. It is perhaps worth noting that the trial court imputed $1,560 in income to Wife when she was not then employed and was not employed during the vast majority of the marriage. So the court's approach to both income and expenses involved projections that took into account Wife's circumstances in the longer term.

subsidizing Wife's savings by paying money for fees that will cease to exist after approximately eighteen months. Even when alimony is combined with her imputed salary, Wife is left with a deficit of expenses over income that far exceeds her monthly attorney fees obligation.

### 2. The Alimony Award Was Not Disproportionate.

¶ 25 Husband next argues that the court abused its discretion by awarding Wife $2,182.50 per month in alimony because the award disproportionately burdens him and because the findings of fact regarding Wife's needs and Husband's ability to pay are insufficient to support it. Husband claims that in using his gross income to calculate his ability to pay, the court "ignored [his] obligation to pay taxes, and [the] costs and inconvenience to earn the salary" because his employment required him to travel to an out-of-town job site. For purposes of determining alimony, however, the court accepted Husband's entire monthly budget of $7,270, which included $1,466 in taxes (social security, federal and state income, and Medicare) as well as $910 in rent and transportation expenses associated with the commute to his remote work location. Husband fails to even acknowledge this aspect of the trial court's analysis. Thus, his argument amounts to little more than a disagreement with the court's decision without any meaningful consideration of the factual underpinnings of the court's pertinent findings or resulting order. This is insufficient to challenge the finding on appeal. *Bell v. Bell*, 2013 UT App 248, ¶ 30, 312 P.3d 951 ("[A] party challenging a trial court's factual finding must do more than merely reargue the evidence supporting his or her position...." (citation and internal quotation marks omitted)).

¶ 26 Nor does the court's effort to equalize the parties' standard of living disproportionately burden Husband. The purpose of equalization is to ensure that when the parties are unable to maintain the standard of living to which they were accustomed during marriage, the shortfall is equitably shared. *Sellers*, 2010 UT App 393, ¶ 3, 246 P.3d 173. Indeed,

[i]ncome equalization, as imposed by the courts in divorce proceedings, is perhaps better described as "equalization of poverty." In other words, the courts will equalize the incomes of the parties only in those situations in which one party does not earn enough to cover his or her demonstrated needs and the other party does not have the ability to pay enough to cover those needs.

*Id.* And as we discussed above, this is the exact circumstance the court found in this case: the court's calculation of alimony resulted in Wife having a $2,335.50 monthly shortfall ($6,078 in expenses minus $1,560 in imputed income and $2,182.50 in alimony), while Husband's shortfall is less, only $1,203.50 per month ($7,270 in expenses and $2,182.50 for the alimony payment minus $5,925 in earned income and $2,324 in rental income). The court's imposition of a lesser burden on Husband in shouldering the parties' income deficit appropriately recognizes both the extra effort that Husband must exert to obtain his monthly income and Wife's need for assistance in maintaining her own household.

¶ 27 Because the court articulated both the basis for the alimony award and its calculation of that award in its findings and because the award appropriately considers Wife's needs and Husband's ability to pay, we find no error in the court's decision to award Wife $2,182.50 per month in alimony.

### B. Husband Has Not Carried His Burden of Establishing that the Court Erred in Awarding Retroactive Alimony.

¶ 28 Finally, Husband contests the court's order that alimony be retroactive to October 1, 2010, arguing that "[d]uring those months, the expenses [Wife] lists were not incurred." The validity of this position is not self-evident, especially in light of our rejection of his argument that the court erred in basing the alimony award on Wife's marital standard of living rather than on her actual expenses during the separation. Yet Husband does not offer any legal authority or analysis to support his assertion. Accordingly, we decline to consider it further. *See Springville Citizens for a Better Cmty. v.*

*City of Springville,* 1999 UT 25, ¶ 21 n. 2, 979 P.2d 332 (explaining that appellate courts need not consider issues that the appellant fails to adequately brief).

## II. Property Distribution

¶ 29 Husband also challenges the trial court's orders regarding the distribution of certain property. Specifically, Husband contends that the evidence does not support the court's findings and its conclusion that he coerced Wife to repay him the $4,505 she had withdrawn from a marital account after the parties' separation. Husband also contests the court's order that the TSP account be divided in dollars based on the value of the shares on October 28, 2011.

### A. The Trial Court's Findings and Conclusion that Husband Coerced Wife To Repay Him $4,505 Are Supported by the Evidence.

¶ 30 Just after the parties separated, Wife withdrew $4,505 from a joint banking account primarily used by Husband, one half of the total amount in the account. Wife later paid $4,505 to Husband in response to his demand that she repay the amount of the withdrawal in order to gain access to personal property she had arranged to pick up at his house. The trial court determined that Husband coerced Wife into repaying the money and ordered it credited back to her. Specifically, the court found,

> On June 17, 2011, after the Parties had resolved [most of the personal property distribution] ..., [Wife] arrived at the marital home with a moving van to move her personal property. Despite [Wife]'s emotional problems, [Husband] told [Wife] that [she] could have the piano if she agreed to pay back the $4,505 that [she] withdrew from the marital accounts after the separation. [Wife] agreed and [Husband] deducted the $4,505 from the remaining $10,788 to be dispersed as the remaining funds from the refinance.

The court concluded that Wife had agreed to Husband's demand because "she was very upset and just wanted to leave the situation."

¶ 31 Husband argues that the trial court could not have reached such a conclu-sion because there were "[n]o actual facts [to] support a finding of ... unlawful coercion." A party challenging a finding of fact in a bench trial must "demonstrate that the evidence is legally insufficient to support the finding ... when viewing [the evidence] in a light most favorable to the court below." *Chen v. Stewart,* 2004 UT 82, ¶ 76, 100 P.3d 1177. This is a heavy burden, as appellate courts must "not ... set aside [a finding of fact] unless clearly erroneous," having given "due regard ... to the opportunity of the trial court to judge the credibility of the witnesses." Utah R. Civ. P. 52(a).

¶ 32 Husband fails to effectively meet his burden of persuasion on this issue because he overlooks substantial evidence in the record that supports the court's findings and conclusion. Both Husband and Wife testified that Wife had long suffered from depression, which had, at times, caused her to become "distraught" and unable to appropriately handle stressful situations. They also testified that Husband had agreed that she could remove her personal property on June 17, 2011, and that he was aware that to accomplish this, Wife would have to make arrangements to travel from Sigurd, Utah, where she was staying with a relative, to the marital home in River Heights, Utah. On June 17, she left Sigurd with a moving van she had hired, accompanied by people she had brought along to help with the work. Wife testified that despite their agreement, she arrived in River Heights to find the driveway and garage blocked by Husband's vehicles and the house "dead-bolted, locked." When Husband answered the door, he told her, "[Y]ou're not taking anything until we've settled the [$]4,505 that you owe me from my account that you took." Husband acknowledged that Wife acceded to his payment demand prior to Wife removing any items from the home, though he described the circumstances differently.

¶ 33 Husband's alternative explanation for Wife's agreement to pay him the $4,505—i.e., that she received additional personal property in exchange for $4,505—certainly finds evidentiary support in the record, but the trial court resolved the conflicts in the evidence against Husband's position. The court

determined that Husband took advantage of Wife's "emotional problems" to coerce her to "pay back $4,505 that [she] withdrew after the separation" in exchange for the piano. Husband has not demonstrated that the trial court erred.

¶ 34 The resolution of this issue ultimately required the court to determine the relative weight and credibility of each witness's testimony in order to resolve conflicting evidence. Credibility determinations are within the province of the trial judge, who is uniquely equipped to "mak[e] factual findings based exclusively on oral testimony" due to his or her opportunity to "view[ ] the witnesses firsthand, to assess their demeanor and to consider their testimonies in the context of the proceedings as a whole." *Henshaw v. Henshaw*, 2012 UT App 56, ¶¶ 11–12, 271 P.3d 837. Accordingly, "due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses," Utah R. Civ. P. 52(a), and "absent a proper showing that the trial court erred, we will not revisit the facts on appeal," *Henshaw*, 2012 UT App 56, ¶ 12, 271 P.3d 837 (citation and internal quotation marks omitted). In his attempt to undermine the court's credibility determination, Husband points to the court's rejection of Wife's testimony that she paid Husband by check on the date of the renegotiation, testimony that Husband characterizes as perjury. The trial court, however, determined that Wife was "confused about the check," as opposed to lying. Husband dedicates the rest of his analysis on this issue to rearguing the facts that support his characterization of the events that led to Wife's payment of $4,505. But "a party challenging a trial court's factual finding must do more than merely reargue the evidence supporting his or her position. . . ." *Bell v. Bell*, 2013 UT App 248, ¶ 30, 312 P.3d 951 (citation and internal quotation marks omitted). Instead, a party challenging the findings of fact must "demonstrate that the evidence is legally insufficient to support the finding . . . when viewing [the evidence] in a light most favor-

able to the court below," *Chen*, 2004 UT 82, ¶ 76, 100 P.3d 1177, because the finding is "in conflict with the clear weight of the evidence," *Kimball v. Kimball*, 2009 UT App 233, ¶ 14, 217 P.3d 733. Accordingly, we decline to disturb the trial court's findings that led to its order that Husband return the $4,505 to Wife.[11]

## B. The Trial Court Did Not Abuse Its Discretion in Dividing the TSP Account.

¶ 35 Husband next contends that the trial court abused its discretion in distributing his TSP account by dividing its cash value on October 28, 2011, rather than by simply allocating Wife half the shares as of March 31, 2011. Husband's argument has two components: first, he asserts that the settlement agreement required the account to be divided according to shares, not dollars, on March 31, 2011; second, he claims that in the absence of strict compliance with the settlement agreement, "the more equitable division date" is October 1, 2010, when his obligation to pay temporary alimony began.

¶ 36 "Trial courts have considerable discretion in determining . . . property distribution in divorce cases, and will be upheld on appeal unless a clear and prejudicial abuse of discretion is demonstrated." *Stonehocker v. Stonehocker*, 2008 UT App 11, ¶ 8, 176 P.3d 476 (omission in original) (citation and internal quotation marks omitted). The burden is on the appellant to show that the trial court acted outside of that discretion by showing that the property division resulted in clear prejudice. *Id.* Husband has failed to satisfy his burden. First, he has not properly challenged the trial court's determination that the settlement agreement contemplated division of the TSP account by cash value. Second, he has not demonstrated any prejudice from the court's choice of date from which to calculate distribution.

¶ 37 Through mediation, Husband and Wife had agreed to "evenly divide the TSP savings plan as of March 31, 2011." The

11. Husband also asserts that "[t]he trial court's decision to find [him] guilty of 'unlawful coercion' violates his civil rights, if it is a crime." Husband does not provide any analysis to support this novel argument. Accordingly, we limit our analysis to the question of whether the evidence supports the facts underlying the conclusion to award Wife the $4,505 she repaid to Husband.

settlement agreement does not specify whether that division was to be made by shares or dollars, and either interpretation seems plausible. The trial court considered evidence from both Wife and Husband bearing on the issue, with Wife presenting evidence that dividing a thrift savings plan by shares was not feasible and Husband testifying about the parties' intent to "divide the existing shares." *See Daines v. Vincent*, 2008 UT 51, ¶ 25, 190 P.3d 1269 (explaining that when a contract is facially ambiguous, the court may consider parol evidence of the parties' intentions). In the end, the court determined that the account should be divided by dollar value. The court's approach is consistent with the long-recognized "preference for valuation of the non-employee spouse's share and its immediate cash-out from other assets." *Chambers v. Chambers*, 840 P.2d 841, 845 (Utah Ct.App.1992) (citing *Woodward v. Woodward*, 656 P.2d 431, 433 (Utah 1982)); *see also Griffith v. Griffith*, 959 P.2d 1015, 1020 (Utah Ct.App.1998) (reiterating the preference to cash-out the non-employee spouse because "[a]warding retirement benefits solely to the employee spouse comports with the goal of allowing the parties to make as much of a clean break from each other as is reasonably possible" (citation and internal quotation marks omitted)), *aff'd*, 985 P.2d 255 (Utah 1999). On appeal, Husband simply reasserts that the shares themselves could be divided and does not engage in any meaningful discussion of ambiguity in the settlement agreement or provide any citation to or analysis of the case law on contract interpretation. Husband has therefore failed to properly challenge the trial court's resolution of the ambiguity on conflicting evidence, and the court's interpretation of the settlement agreement is therefore "placed beyond the reach of further appellate review." *See Benns v. Career Serv. Review Office*, 2011 UT App 362, ¶ 2, 264 P.3d 563 (per curiam).

■■ ¶ 38 Husband's criticism of the court's decision to value the TSP account as of October 28, 2011, is likewise unavailing. Husband's primary argument is that because "the trial court selectively disregarded parts of their negotiated agreement"—for example, when it ordered Husband to repay Wife the $4,505 she withdrew from the marital account despite his position that she had received additional personal property in return—it could "also disregard [the settlement agreement's terms about] when to divide the TSP."

¶ 39 The settlement agreement provides that Husband and Wife "will evenly divide the TSP savings plan as of March 31, 2011." By the time of trial, however, no distribution of that account had been sought or obtained. At trial, the court received evidence of the number and value of the shares in the TSP account on October 1, 2010, the date that temporary alimony was ordered; March 31 and April 1, 2011, the date upon which the TSP was to be divided and the day after; and October 28, 2011, just before trial. On October 1, 2010, the account held 2,420.5212 shares with a per share value of $18.4578. On March 31 and April 1, 2011, the account had 2,992.4822 shares; the share value on March 31 was $22.9421, while the share value on April 1 was $23.0797. By October 28, 2011, the number of shares had increased to 3,484.8029, but each share's value had dropped to $21.1507. The court elected to award Wife the cash value of half of 2,992.4822 shares (the number on March 31, 2011, as the settlement agreement contemplated) but valued them as of October 28, 2011, so as "not [to] penalize[ Husband] for any decrease in value" between the mediation and trial when the parties had not acted to timely distribute the account.

■■ ¶ 40 Husband asserts that rather than dividing the account as of October 28, 2011, the "more equitable division" would have been to value the shares as of the date that Wife began receiving temporary alimony, October 1, 2010. According to Husband, "equity suggests he should not be ordered to pay temporary spouse support ... and also keep dividing TSP shares accumulated after temporary spouse support begins." Husband's argument on appeal echoes the argument he made below, which the trial court rejected. Husband, however, does not offer any reason, much less supporting legal authority, on why it was more equitable in the broader circumstances affecting both parties,

as opposed to simply more favorable to him, to divide the shares as of October 1, 2010. Trial courts have broad equitable powers in the division of marital property that will not be disturbed on appeal without a showing of "a clear and prejudicial abuse of discretion." *Stonehocker*, 2008 UT App 11, ¶ 8, 176 P.3d 476. The court's finding demonstrates that it intended to enforce the parties' settlement agreement—to "evenly divide the TSP savings plan"—but to do so taking into account the changed circumstances at the time of trial—the passing of nearly eight months during which Wife failed to present a QDRO for distribution of the account and the value of the shares had decreased. Such a decision seems to be well within the equitable discretion accorded to the trial court, and no prejudice to Husband is apparent; the fact that the court might have chosen a valuation date more advantageous to Husband is not in itself the kind of prejudice that the test contemplates. *See id.* We therefore decline to disturb the court's distribution of the TSP account.

### III. The Mortgage on the Marital Home

¶ 41 The trial court ordered that Husband take steps to "remove [Wife]'s name from the mortgage of the marital home within ninety days of the issuance of [the] Memorandum Decision" on December 19, 2011. Husband challenges the court's order on two alternative grounds. First, he contends that the court could not order him to take action to remove Wife's name from the mortgage because that was not a term of the parties' settlement agreement. In his reply brief, Husband clarifies that the parties had discussed a six-to-twelve-month time period for him to take steps to remove Wife's name from the mortgage but claims they never reached a formal agreement that he would do so or as to the timing in which it would be completed. Husband further asserts that any court-imposed requirement that he take steps to remove Wife's name from the mortgage must allow him time after the issuance of the decree to comply. Alternatively, he asserts that the court's order was impossible to comply with because, as a practical matter, he was incapable of obtaining new financing until after the final divorce decree issued on

March 9, 2012, a mere nine days before the court-imposed deadline of March 18, 2012. Husband also contends that he now may be unable to qualify for a refinancing loan due to the skewing of his income-to-debt ratio created by the divorce decree.

¶ 42 Husband's first argument amounts to a challenge to the court's factual findings that "in return" for Husband's payment in June 2011 of "$1,000 to [Wife] for [Wife] to deed the property to [Husband]," Husband "was required to remove [Wife]'s name from the mortgage within six to twelve months of the agreement," yet, "[a]s of [November 18, 2011], [Wife]'s name was still on the mortgage." "Findings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous. . . ." Utah R. Civ. P. 52(a). A finding is clearly erroneous if it is "in conflict with the clear weight of the evidence." *Kimball v. Kimball*, 2009 UT App 233, ¶ 14, 217 P.3d 733.

¶ 43 Husband contends that the parties never reached any agreement for him to take action to remove Wife's name from the mortgage because although this issue was discussed during mediation, it was not included in the settlement agreement itself. At trial, however, Husband took a different position, acknowledging his understanding that Wife had executed a deed conveying her interest in the marital home to him in June 2011 and that he "had six months to a year" from that date to refinance the marital home to remove Wife's name from the mortgage. Husband now asserts that if this testimony can be interpreted to be an affirmative representation that the parties had reached an agreement on the matter, his testimony should be read "in the context of doing that after the Decree was entered" because "it was very apparent that the name could not be removed without a finalized Divorce Decree." At the November 2011 trial, however, Husband stated that the six months was coming up in "the middle of December" and that based on his discussions with two banks, he expected to complete the refinancing process within one to two months. This evidence supports the trial court's findings that in exchange for Husband's payment to Wife in June 2011 of her remaining share of the

equity in the home, Husband had agreed to take steps that would result in the removal of Wife's name from the mortgage within six to twelve months.[12]

¶ 44 Alternatively, Husband asserts that compliance with the order to take steps to remove Wife's name by March 18, 2012, was impossible. We are not persuaded. Husband did not offer the trial court any evidence that his ability to refinance was dependent upon the entry of a final divorce decree. To the contrary, as discussed above, Husband testified at trial that he recognized that he needed to act upon his obligation to restructure the mortgage so as to remove Wife's name within six to twelve months and that because six months was coming up in mid-December, he had begun working with a lender to obtain a new mortgage. Husband expressed no concern about the feasibility of complying within the six-to-twelve-month period or before the issuance of a final divorce decree; in fact, he indicated that based on his discussions with the lender, he expected to complete the refinancing within "a month or two." The court apparently accepted that testimony and even gave Husband an additional two months (a total of nine months) to complete the refinancing.[13]

¶ 45 Finally, it does not appear that Husband presented his claim that he may not be able to qualify for a refinancing loan due to the skewing of his income-to-debt ratio created by the divorce decree to the trial court, and it is therefore unpreserved for our review. *See 438 Main St. v. Easy Heat, Inc.,* 2004 UT 72, ¶ 51, 99 P.3d 801 (explaining that an issue is unpreserved when it has not been "presented to the trial court in such a way that the trial court has an opportunity to rule on that issue" and appellate courts need not consider unpreserved issues). To the extent that Husband's concerns involve

events occurring after the entry of the divorce decree, Husband's remedy is to seek relief in the trial court; it is not a matter for resolution on appeal.

¶ 46 Accordingly, we affirm the trial court's order.

### IV. The Divorce Decree

A. Incorporation by Reference of the Settlement Agreement and Memorandum Decision in the Divorce Decree

■ ¶ 47 Husband next argues that the decree "should not incorporate by reference documents subject to interpretation," specifically, the parties' settlement agreement and the court's memorandum decision. To support his position, Husband quotes the language in rule 54(a) of the Utah Rules of Civil Procedure that provides, "[A] judgment shall not include any matter by reference," Utah R. Civ. P. 54(a). Husband, however, fails to acknowledge the introductory clause of the sentence he quotes, which states, "[U]*nless otherwise directed by the court,* a judgment shall not include any matter by reference." *Id.* (emphasis added).

■ ¶ 48 In interpreting rules of procedure, appellate courts apply "our general rules of statutory construction," which require that we attribute to a rule's language its ordinary meaning and read the provision as a whole. *Arbogast Family Trust v. River Crossings, LLC,* 2010 UT 40, ¶ 18, 238 P.3d 1035; *Martinez v. Media–Paymaster Plus/ Church of Jesus Christ of Latter–day Saints,* 2007 UT 42, ¶ 46, 164 P.3d 384. Under these canons of statutory construction, the qualifying clause "unless otherwise directed by the court" can be read to imply that the trial court has discretion to include a matter by

---

12. Husband also contends that the trial court's finding that Wife's name was still on the mortgage was incomplete because it "omits to also find that as of the final order, the Deed to [Husband] had not yet been recorded." The trial court itself rejected Husband's similar objection to the memorandum decision on the basis that it simply asked the court to "provide 'more appropriate background'" without affecting the substance of the court's ruling. We agree with the trial court. Its findings, as written, lend support

to its order that Husband remove Wife's name within ninety days of the memorandum decision.

13. Although Husband asserts that the court should have allowed him six to twelve months from the date of the final decree to refinance and remove Wife's name from the mortgage, there is no indication in the record or in briefing that Husband has yet removed Wife's name from the mortgage.

reference in a judgment if the court judges it useful or appropriate to do so.

¶ 49 Husband has not cited any authority in support of a contrary reading of the rule. Rather, he simply argues that referencing other documents in the divorce decree "adds confusion by layering actual findings with documents that do, and don't refer to each other." But Husband fails to show how the court's doing so in this case created confusion or otherwise prejudiced him, and there does not appear to be anything on the face of the decree that creates confusion about which documents the decision depends upon or what the court is ordering the parties to do.

¶ 50 A final divorce decree is intended to implement the court's decision, which may have been otherwise explained, analyzed, and supported in separate court documents, such as a memorandum decision or findings of fact and conclusions of law. That was the case here, and there seems to be little practical benefit in repeating the basis for the trial court's decision in the final decree when the court thoroughly stated its reasoning in the memorandum decision. Under the circumstances, the trial court's decision to include the memorandum decision and settlement agreement by reference only was an appropriate exercise of the broad discretion it is granted.

B.  Inclusion of Matters in the Divorce Decree that Were Not Part of the Memorandum Decision

¶ 51 Finally, Husband challenges the trial court's inclusion in the final divorce decree of "matters not included within the December 1[9], 2011 Memorandum Decision" or resolved at trial. In particular, Husband contests the court's order that alimony continue until "[Wife]'s remarriage or cohabitation with another person, as provided by Utah Code Ann. § 30–3–5 (1953 as amended), the death of either party, or the length of the marriage, which is 32 years," and its specification of the language to be included in the QDROs needed for Wife to receive her distributions from multiple retirement accounts.

¶ 52 Husband argues that not only was the duration of alimony not addressed at trial but the court's sua sponte decision to allow ali-mony to continue for up to thirty-two years effectively precludes him from retiring before age eighty-eight. Husband did not preserve the issue of alimony duration in the trial court, and we therefore will not consider it on appeal. *See 438 Main St. v. Easy Heat, Inc.,* 2004 UT 72, ¶ 51, 99 P.3d 801 (explaining that when an issue has not been "presented to the trial court in such a way that the trial court has an opportunity to rule on that issue," then it is not preserved for appeal and appellate courts need not consider it).

¶ 53 Alimony was a significant issue at trial, and if the trial court ultimately were to decide to award alimony to Wife, it would naturally be required to establish a time period during which alimony was to be paid. Utah law provides that except in extenuating circumstances, "[a]limony may not be ordered for a duration longer than the number of the years that the marriage existed." Utah Code Ann. § 30–3–5(8)(j) (LexisNexis Supp.2013). Thus, an award of alimony up to the length of the marriage falls within the trial court's "broad discretion." *See Childs v. Childs,* 967 P.2d 942, 946 (Utah Ct.App. 1998) ("Trial courts have broad discretion in making alimony awards. Therefore, we will not disturb [such an] award so long as the trial court exercised its discretion within the appropriate legal standards...." (citation omitted)). Given that Husband and Wife's marriage was one of long duration, in which Wife had primarily been a homemaker and had not acquired substantial work skills or experience, it is unsurprising that the court awarded her alimony for the same period of time (with the usual termination provisions). This is especially true considering that neither party offered any alternative time period as a reasonable length for the alimony award. Thus, even though the parties did not address the length of alimony directly, given the significant attention dedicated to the question of whether alimony ought to be awarded, Husband should have anticipated a ruling on the duration of any alimony awarded.

¶ 54 If Husband desired to offer the court evidence or argument on the alimony term,

he had a responsibility to raise the issue at trial or, alternatively, in the motion for relief from judgment that he filed after the court decision—in which he objected to inclusion of the QDRO language but made no mention of the alimony term. *See Dickman Family Props., Inc. v. White*, 2013 UT App 116, ¶¶ 1213, 302 P.3d 833 (declining to consider the appellants' contempt argument on appeal where the appellants not only failed to alert the district court to their position at the contempt hearing but also failed to bring this issue to the court's attention in their objection to its order). Husband's objection to the alimony term ruling is something that could have been readily resolved had Husband brought it to the trial court's attention at the appropriate time. *See Patterson v. Patterson*, 2011 UT 68, ¶ 15, 266 P.3d 828 (noting that one purpose of the preservation rule is to allow the trial court an opportunity to correct the error in the first instance). Accordingly, we will not address the merits of the decision here; Husband must seek whatever relief may be available in the trial court under applicable rules of procedure. *Cf. Nelson v. Nelson*, 2004 UT App 254, ¶¶ 23, 5, 97 P.3d 722 (explaining in the context of resolving whether there had been a material change in circumstances to justify modification of an alimony award that a "claim to entitlement to retire" is "not ripe for judicial determination" if the party "had not [yet] retired").

¶ 55 Next, Husband takes issue with the court's inclusion in the decree of QDRO language to divide the retirement accounts that was apparently intended to direct the account administrators to distribute the funds in accordance with the provisions of the decree. Husband argues that "[t]he language about Qualified Domestic Relations Orders, Decree Paragraphs 4, 5, 6 and 7, goes beyond the Memorandum Decision." However, Husband does not provide any explanation or authority for his position that the court was prohibited from including such language in a decree where the parties specifically indicated that QDROs were needed to distribute the parties' retirement accounts, including those on which they had reached an agreement regarding division. Nor does he identify any error in the QDRO language that the court

specified. He simply asserts that because the court did not include the same language in its memorandum decision, it could not do so in the decree. This is insufficient to satisfy his appellate briefing requirements, and we therefore will not consider the issue. *See Springville Citizens for a Better Cmty. v. City of Springville*, 1999 UT 25, ¶ 21 n. 2, 979 P.2d 332.

## CONCLUSION

¶ 56 We affirm on all issues. There was no abuse of discretion in the trial court's alimony award because it is supported by adequate facts and those facts are supported by the evidence. Husband has failed to properly challenge the retroactive alimony order.

¶ 57 Regarding the $4,505 payment, the trial court elected to believe Wife's version of the events, and Husband has not demonstrated any error with that decision. Husband also has not shown that the court erred in determining that the settlement agreement contemplated a division of the TSP account by its cash value, and we conclude that it was appropriate for the court to adapt the terms of the settlement agreement to take into account the present circumstances, which involved a decrease in the account value and Wife's failure to timely present a QDRO. The trial court also did not abuse its discretion in ordering Husband to remove Wife's name from the mortgage on the marital home within ninety days of the issuance of the memorandum decision.

¶ 58 Finally, the trial court acted within its discretion in determining that the parties' settlement agreement and the memorandum decision could be incorporated by reference into the final divorce decree. Husband's complaint about the inclusion of a term for the payment of alimony is not preserved, and we do not consider Husband's challenge to the decree's inclusion of QDRO language because Husband has not adequately briefed the issue.

¶ 59 Affirmed.