**2017 UT App 137**

## THE UTAH COURT OF APPEALS

GEOFFREY S. RULE,
Appellee,
*v.*
RICHELLE RULE,
Appellant.

Opinion
No. 20150633-CA
Filed August 3, 2017

Third District Court, Salt Lake Department
The Honorable Su J. Chon
No. 134901588

Edward J. Stone, Attorney for Appellant

Suzanne Marelius, Attorney for Appellee

JUDGE STEPHEN L. ROTH authored this Opinion, in which JUDGES GREGORY K. ORME and JILL M. POHLMAN concurred.[1]

ROTH, Judge:

¶1 Richelle Rule appeals from the district court's final order on its supplemental findings and conclusions regarding her alimony award. We reverse and remand for further proceedings.

---

1. Judge Stephen L. Roth participated in this case as a member of the Utah Court of Appeals. He retired from the court before this decision issued.

BACKGROUND

¶2    Geoffrey S. Rule and Richelle Rule[2] married in March 1997. They divorced by bifurcated decree in March 2014, reserving for trial several issues, including alimony.

¶3    Before the May 2014 trial, both parties submitted updated financial declarations to the district court. In her declaration, Richelle included both the expenses incurred during marriage and the actual expenses she was incurring at the time of trial for many of the categories of monthly expenses—essentially providing the court with both a marital standard of living and her reduced living standard during the period after separation and before trial. For example, for her housing expenses, she indicated that the mortgage during her marriage was approximately $1,300 a month, but that her current rental expense was $950 a month. She also included estimates for certain expenses based on expected homeownership similar to that enjoyed during the marriage. For example, regarding utilities, she noted that she was spending $50 a month on gas in her current circumstances but estimated it would cost an additional $125 a month based upon the "lifestyle established during the marriage." And she included among her expenses voluntary and discretionary items based upon the marital standard of living that she was not currently able to afford, such as an approximately $600 monthly retirement contribution, $50 in donations, $80 in gifts, $300 in travel, and $120 in entertainment. In Geoffrey's declaration, the amounts itemized in a majority of the expense categories were identical to Richelle's declared marital standard of living expenses. For example, Geoffrey also included approximately $1,300 a month in mortgage expenses and a $600 monthly retirement contribution.

---

2. Because the parties share the same last name, we refer to them individually by their first names for convenience.

¶4 Both parties were employed during the marriage. Geoffrey continued to work full time as a scientist and indicated that he earned a gross income of approximately $5,900 a month. Richelle had held various jobs during the marriage—most of them part time—but at the time of trial was unemployed and had been since late summer the year before. Richelle indicated in her updated financial declaration that her only income at the time was a temporary alimony and child support award of $1,500 a month. At trial she presented a report and testimony from a vocational expert regarding her employment potential. The report noted that Richelle had most recently been employed as a customer service agent in the insurance industry with an hourly wage of $17.00, but it also noted that there were ongoing concerns that significantly impacted her ability to be successful at work. Having reviewed Richelle's vocational history, records related to her employability, and the results of the vocational testing, the expert opined that Richelle would not be able to work full time and could "have difficulty in the workplace with even part-time work." Nonetheless, the expert stated that Richelle might be able to perform "lower skilled job tasks . . . in a small, low stress office environment," and that her earning capacity would be maximized by part-time employment as an insurance processing clerk making $12.00 per hour. The vocational expert recommended that Richelle work with the State Division of Rehabilitation Services to assist her with placement in an appropriate setting.

¶5 Following trial, the court entered its first supplemental findings of fact and conclusions of law as well as a supplemental decree of divorce addressing the issues reserved for trial. With respect to alimony, the court made findings addressing the parties' respective incomes, monthly expenses, and needs. The court determined that Geoffrey's gross monthly income was $6,167, with a net monthly income of $5,466. Turning to Richelle, the court found that, based on the vocational expert's testimony and report, Richelle required retraining in another field in order to transition from part-time to full-time employment, which it

noted may take "approximately two years." Based on this, the court concluded that it was appropriate to impute minimum wage to Richelle in the amount of $1,257 per month gross income or $1,005 net income.

¶6     As to Richelle's needs and Geoffrey's ability to support her, the court expressly declined to make any finding regarding the standard of living established during the marriage because it found that "neither party [could] maintain the standard of living established during the marriage, given the divorce." Instead, the court determined each party's reasonable monthly expenses by "review[ing] both Financial Declarations of the parties and . . . discount[ing] anything that was voluntary and discretionary." With regard to Richelle's claimed expenses, the court made adjustments to reflect "actual" rather than "estimated" or "projected" expenses. After making its adjustments, the court determined that Richelle had reasonable monthly expenses of $3,100 and, after subtracting her imputed income and child support, an unmet need of $1,362. The court found, after making adjustments to some expense categories in Geoffrey's financial declaration, that he could not "provide for all of [Richelle's] unmet financial need" but had "the ability to contribute the sum of $814 . . . to [her]." Ultimately, the court awarded Richelle alimony in the amount of $814, to continue for the term of the marriage—seventeen years.

¶7     Following the entry of the court's supplemental decree, Richelle filed a motion under rule 59 and rule 60 of the Utah Rules of Civil Procedure, requesting additional findings and conclusions or relief from judgment. Richelle argued that the court erred by declining to "make a finding of the parties' monthly needs consistent with the standard of living established during the marriage." She asserted that both parties had presented evidence of the "standard of living established during the marriage" through their financial declarations and that Utah precedent required the court to assess her needs in light of the parties' marital standard of living; thus, it was inappropriate for

the court to make its needs assessment based only on the parties' reduced circumstances after separation. Richelle contended that, partly as a consequence of this error, the court erred by failing to equitably apportion between the parties the burden of inadequate resources according to established precedent.

¶8 In response to Richelle's motion, the court issued a second set of supplemental findings and conclusions and order. The court again refused to address alimony based upon the parties' marital standard of living, stating that it evaluated Richelle's "standard of living at the time of trial to determine her need given that there is not enough money to cover the [marital] standard of living." The court adjusted Geoffrey's net monthly income from its earlier figure of $5,446 to $4,810, apparently by applying a higher 22% tax rate to his gross monthly income of $6,167. It also further adjusted and reduced Richelle's monthly needs based upon "actual amounts stated at trial" and specifically "exclude[d] any amounts" for "voluntary, discretionary expenses," such as donations, gifts, and retirement contributions. After the adjustments, it determined that Richelle had a "reasonable budgetary need of $2,702." The court similarly reduced certain of Geoffrey's claimed expenses it labeled as "unnecessary present expenses," including some it considered to be discretionary, such as donations and retirement contributions. The court then found that Geoffrey had "reasonable monthly expenses" of $3,198. Ultimately, the court increased Richelle's alimony award from $814 to $874 per month and ordered Geoffrey to pay total monthly support in the amount of $1,612, including alimony and child support. This award left Richelle with monthly income of $2,617 to meet $2,702 of expenses, and Geoffrey with exactly $3,198 to meet his $3,198 of monthly expenses.

¶9 Richelle appeals from the court's supplemental order, challenging the court's alimony determinations and conclusions.

ISSUES AND STANDARDS OF REVIEW

¶10  Richelle argues that the district court abused its discretion by assessing her needs and calculating alimony based upon her actual expenses at the time of trial rather than the standard of living established during the marriage. She also argues that the court's findings are not adequate to support its ultimate alimony determination. And she argues that the district court failed to properly equalize the parties' standards of living.

¶11  "Trial courts have broad latitude in determining whether to award alimony and in setting the amount," and we will not lightly disturb a trial court's alimony ruling. *See Dobson v. Dobson*, 2012 UT App 373, ¶ 7, 294 P.3d 591. However, we will reverse if the court has not "exercise[d] its discretion within the bounds and under the standards we have set." *Id.* (citation and internal quotation marks omitted). In addition, a trial court "must make sufficiently detailed findings of fact on each [statutory] factor to enable a reviewing court to ensure that the trial court's discretionary determination was rationally based upon these . . . factors," which requires including "enough subsidiary facts to disclose the steps by which the ultimate [alimony] conclusion" was reached. *Mark v. Mark*, 2009 UT App 374, ¶ 9, 223 P.3d 476 (omission in original) (citations and internal quotation marks omitted). "The absence of findings of fact is a fundamental defect that makes it impossible to review the issues that were briefed without invading the trial court's fact-finding domain," and as a result, if there are insufficient findings, "we must reverse unless the record is clear and uncontroverted such as to allow us to apply the [statutory] factors as a matter of law on appeal." *Id.* (alteration in original) (citations and internal quotation marks omitted).

ANALYSIS

¶12  Richelle contends that the court abused its discretion by failing to determine the marital standard of living and evaluate

alimony in light of that standard, and by failing to equalize the parties' post-divorce standards of living. She also argues that the district court's findings inadequately support the budgetary reductions it made to arrive at its determination of her reasonable monthly needs. Geoffrey, in contrast, argues that we should affirm the district court's alimony award, because the court was within its discretion to base alimony on actual expenses at the time of trial; the court considered the required alimony factors and the marital living standard and supported its decision with adequate findings; and the ultimate result is equitable under the circumstances of the case. We agree with Richelle.

## I. Alimony Standards and Policies

¶13 In setting an alimony award, district courts must consider the statutory factors set forth in Utah Code section 30-3-5(8)(a), and failure to do so constitutes reversible error. *See Jones v. Jones*, 700 P.2d 1072, 1075–76 (Utah 1985). These factors include "(i) the financial condition and needs of the recipient spouse; (ii) the recipient's earning capacity or ability to produce income; [and] (iii) the ability of the payor spouse to provide support." Utah Code Ann. § 30-3-5(8)(a)(i)–(iii) (LexisNexis 2013).

¶14 An alimony award should also "advance, as much as possible," the primary purposes of alimony, *see Hansen v. Hansen*, 2014 UT App 96, ¶ 6, 325 P.3d 864 (citation and internal quotation marks omitted), which are: "(1) to get the parties as close as possible to the same standard of living that existed during the marriage; (2) to equalize the standards of living of each party; and (3) to prevent the recipient spouse from becoming a public charge," *Jensen v. Jensen*, 2008 UT App 392, ¶ 9, 197 P.3d 117 (citation and internal quotation marks omitted). Indeed, we have explained that alimony is not limited "to provid[ing] for only basic needs" but should be fashioned in consideration of "the recipient spouse's station in life" in light of the parties' "customary or proper status or circumstances," with

the goal being an alimony award calculated "to approximate the parties' standard of living during the marriage as closely as possible." *Howell v. Howell*, 806 P.2d 1209, 1211–12 (Utah Ct. App. 1991) (citation and internal quotation marks omitted); *see also Davis v. Davis*, 749 P.2d 647, 649 (Utah 1988) (explaining that "the ultimate test of the propriety of an alimony award is whether, given all of these factors, the party receiving alimony will be able to support him- or herself as nearly as possible at the standard of living . . . enjoyed during marriage" (omission in original) (citation and internal quotation marks omitted)); *Savage v. Savage*, 658 P.2d 1201, 1203 (Utah 1983) ("One of the chief functions of an alimony award is to permit the parties to maintain as much as possible the same standards after the dissolution of the marriage as those enjoyed during the marriage.").

¶15    Our precedent thus reflects and reinforces the general rule that alimony should be based upon the standard of living the parties established during the marriage rather than the standard of living at the time of trial. *See* Utah Code Ann. § 30-3-5(8)(e). This requires a court to determine the parties' needs and expenses as an initial matter in light of the marital standard of living rather than, for example, actual costs being incurred at the time of trial. *See Howell*, 806 P.2d at 1212 (explaining that the marital standard of living "is [not] determined by actual expenses alone," because "[t]hose expenses may be necessarily lower than needed to maintain an appropriate standard of living for various reasons, including, possibly, lack of income"); *see also Dobson v. Dobson*, 2012 UT App 373, ¶ 29, 294 P.3d 591 (reversing an alimony award where there was "no indication in the record that the trial court analyzed [the receiving spouse's] claimed expenses in light of the marital standard of living"). The needs of each party, determined according to the marital standard of living, then provide a baseline from which to craft an alimony award that best fulfills the purposes of alimony—i.e., to allow the parties to go forward in their separate lives with a standard

of living as close as possible to the marital standard and "with relatively equal odds." *See Howell*, 806 P.2d at 1212.

¶16    There are several considerations that support this general rule. First, in many cases, the level of expenses and the standard of living of the separated parties at the time of trial will not be representative of the parties' "customary or proper status or circumstances." *See id.* at 1211. We have therefore cautioned against determining alimony based upon actual expenses at the time of trial because, as Richelle asserts to be true in her case, "[a] party's current, actual expenses 'may be necessarily lower than needed to maintain an appropriate standard of living for various reasons, including, possibly, lack of income.'" *Woolums v. Woolums*, 2013 UT App 232, ¶ 9, 312 P.3d 939 (quoting *Howell*, 806 P.2d at 1212). A party's circumstances and living standard at the time of trial may also necessarily be "significantly more straitened than during the marriage" "due to the [parties'] separation" and the exigencies inherent in building and establishing a separate life apart from his or her spouse. *See Kidd v. Kidd*, 2014 UT App 26, ¶ 24, 321 P.3d 200.

¶17    Second, assessing the parties' needs based upon the marital standard in the first instance makes sense in terms of a court's continuing jurisdiction over divorce cases, particularly in marriages of long duration, as this one was. The receiving spouse's needs ultimately set the bounds for the maximum permissible alimony award. *See Dobson*, 2012 UT App 373, ¶ 16. And while a court has continuing jurisdiction over the alimony award, it may exercise that jurisdiction only to "make substantive changes and new orders regarding alimony *based on a substantial material change in circumstances not foreseeable at the time of the divorce.*" *See* Utah Code Ann. § 30-3-5(8)(i)(i) (emphasis added). As a result, if the court considers the receiving spouse's needs based only upon a reduced standard of living at the time of trial, the resulting needs determination could prevent the receiving spouse from having her alimony increased to a level consistent with the marital standard should economic

circumstances materially change—if, for example, the payor spouse's income substantially increases during the alimony period. *See generally Smith v. Smith*, 793 P.2d 407, 410 (Utah Ct. App. 1990) (explaining that the doctrine of res judicata "bars domestic modification proceedings only where the moving party cannot establish either a substantial change of circumstances or mistake of fact"). And while it would not necessarily be impossible to determine the marital standard of living at a later modification hearing, certainly the potential limitations on the availability of evidence due to the passage of time could make establishing the marital standard much more difficult.

¶18   Also, as a practical matter, it seems inherently problematic for a trial court to attempt to design an alimony award that advances the overall goal of allowing the parties to go forward with their lives "as nearly as possible at the standard of living enjoyed during marriage" without first determining what that standard was in the first instance. A corollary concern is the ability of a court—either at the trial level or on review—to assess whether a particular alimony award is ultimately equitable without a determination of the marital standard as a baseline, even in circumstances where the parties' resources are insufficient to maintain their historical living standard.

¶19   With these principles in mind, we have established a process to be followed by courts considering an award of alimony that is applicable generally, including to cases ultimately involving shortfall situations. First, the court should "assess the needs of the parties, in light of their marital standard of living." *Dobson*, 2012 UT App 373, ¶ 22; *see also Kidd*, 2014 UT App 26, ¶¶ 20–24 (calculating alimony in a shortfall situation based upon the wife's projected home ownership expenses, consistent with the marital standard). This means that the court must determine the parties' needs "reasonably incurred, calculated upon the standard of living . . . enjoyed during the marriage." *Dobson*, 2012 UT App 373, ¶ 22; *see also Bakanowski v. Bakanowski*, 2003 UT App 357, ¶ 12, 80 P.3d 153 (explaining that

the parties' needs should be "based on the parties' historical standard of living"). Next, the court should determine the extent to which the receiving spouse is able to meet her own needs with her own income. If the court determines that the receiving spouse is able to meet all her needs with her own income, "then it should not award alimony." *Dobson*, 2012 UT App 373, ¶ 22.

¶20    If the court finds, however, that the receiving spouse is not able to meet her own needs, it should then "assess whether [the payor spouse's] income, after meeting his needs, is sufficient to make up some or all of the shortfall between [the receiving spouse's] needs and income." *Id.* This step should be undertaken "with an eye towards equalizing the parties' standards of living only if there is not enough combined ability to maintain both parties at the standard of living they enjoyed during the marriage." *Id.* (citation and internal quotation marks omitted). Too often, this is the dilemma that a divorce court must confront—the parties' combined resources do not stretch far enough to meet the legitimate needs of what are now two households rather than one. Although we have referred to this approach as "equalization of income," it is best described as the "equalization of poverty," and its goal "is to ensure that when the parties are unable to maintain the standard of living to which they were accustomed during marriage, the shortfall is equitably shared." *Kidd*, 2014 UT App 26, ¶ 26 (citation and internal quotation marks omitted); *see also Sellers v. Sellers*, 2010 UT App 393, ¶ 3, 246 P.3d 173.

¶21    Once a court has properly determined that a shortfall exists between the parties' resources and needs, we accord trial courts broad discretion in dividing the shortfall and apportioning that burden, so long as the award is equitable and supported by the findings. *See McPherson v. McPherson*, 2011 UT App 382, ¶ 16, 265 P.3d 839 (explaining that the trial court has "discretion to make whatever . . . adjustments it deems necessary to achieve an equalization of the parties' standards of living" so long as it "explain[s] its rationale" with adequate findings);

*Jensen v. Jensen*, 2008 UT App 392, ¶ 9, 197 P.3d 117 (explaining that once the trial court considers the required alimony factors, "we will disturb its alimony award only if there is a serious inequity . . . manifesting a clear abuse of discretion" (omission in original) (brackets, citation, and internal quotation marks omitted)). Equalization does not require a court to award alimony so that each party is left with an equal monthly income. *See Howell v. Howell*, 806 P.2d 1209, 1213 n.3 (Utah Ct. App. 1991) (explaining that equalization does not require "[e]xact mathematical equality of income," but it does require "sufficient parity to allow both parties to be on equal footing financially as of the time of the divorce"); *see also Keyes v. Keyes*, 2015 UT App 114, ¶¶ 39–42, 351 P.3d 90 (reversing an alimony award where, although the court's equalization analysis left both parties with an identical monthly shortfall, the court's decision failed to account for the husband's needs, leaving him with next to nothing to meet his monthly expenses). Rather, it requires a court to divide the shortfall of income equitably between the parties in light of each party's demonstrated needs as well as the other relevant circumstances in the case. *See McPherson*, 2011 UT App 382, ¶¶ 15–16. For example, if one party legitimately has greater needs than the other party, *see Dobson v. Dobson*, 2012 UT App 373, ¶ 24, 294 P.3d 591, or there are other circumstances that bear upon how the shortfall should be divided, *see McPherson*, 2011 UT App 382, ¶ 16, such circumstances should be taken into account during the equalization process and reflected in the ultimate alimony award. Indeed, we have explained that simply "equaliz[ing] the parties' income rather than going through the traditional needs analysis" is an abuse of discretion. *Bakanowski*, 2003 UT App 357, ¶ 12.

¶22   This means that in most cases, "[i]t is . . . incumbent upon the district court to determine the amount necessary to maintain the standard of living established over the course of the marriage rather than [just] the amount that is actually being spent at the time of trial." *Woolums v. Woolums*, 2013 UT App 232, ¶ 9, 312 P.3d 939; *see also Dobson*, 2012 UT App 373, ¶ 24 (explaining that

a trial court is "obligated to assess [the receiving spouse's] needs in light of the parties' marital standard of living"). Once the court has determined that there are insufficient resources to meet the baseline needs established by the marital living standard, the court should then equitably allocate the burden of the shortfall between the parties. *Dobson*, 2012 UT App 373, ¶ 22. And in all cases a court must support its determinations with adequate findings. *See McPherson*, 2011 UT App 382, ¶¶ 13, 16.

## II. The Court's Alimony Determination

¶23    Here, the district court did not follow the process we have established. Instead, it appears to have skipped over the traditional needs analysis and moved directly to address what it perceived to be insufficient resources. In its first supplemental findings of fact and conclusions of law, without making any findings about what constituted the parties' marital standard of living, the district court stated that it "declines [Richelle's] request to make a finding of monthly expenses based on the standard of living established during the marriage for either party based on the finding that neither party can maintain the standard of living established during the marriage, given the divorce." The court repeated this finding in its second (and final) supplemental order, stating that it had evaluated Richelle's "standard of living at the time of trial to determine her need given that there is not enough money to cover the [marital] standard of living." The court then proceeded to compress both parties' budgets by reducing certain of their claimed needs or expenses to amounts the court determined to be more reasonable given the resources available at the time of trial and by cutting entire categories of expenditures it determined to be "unnecessary present expenses." For example, the court reduced Richelle's claimed needs in terms of rent, utilities, and health insurance to "actual amounts" as of the time of trial. It also entirely removed and excluded expenses it determined to be "voluntary, discretionary expenses or estimates" and thereby eliminated "any amounts" for retirement, gifts, donations,

vacations and travel, and education. And in this regard, the court rejected Richelle's contention that the parties should at least be "allowed a monthly retirement contribution as that was regularly done during the marriage," concluding that "there are insufficient funds today to allow either party to have that regular expense," and accordingly removed it from both parties' budgets.

¶24 Thus, the district court did not begin its alimony determination with the traditional analysis of Richelle's needs based on the marital standard of living; the court expressly declined to do so. Rather, the court determined Richelle's needs in the first instance based on the straitened circumstances in which she found herself as a result of the divorce. *See Dobson*, 2012 UT App 373, ¶ 29 (reversing the trial court's needs determination for the receiving spouse where the court reduced expenses without reference to the marital standard of living and instead appeared to have, in the first instance, "applied its own sense of what was reasonable under the circumstances in which [the receiving spouse] found herself as a result of the divorce"). The court's only stated justification for refusing to first assess the parties' needs in light of their historical living standard was insufficient resources. We conclude that in these circumstances, the court exceeded its discretion.

¶25 Here, the court declined to determine the marital standard of living for the parties before even attempting its needs analysis because it had already decided that the parties could not meet it. Even if that conclusion was justified by a broad comparison of the parties' financial declarations and their available incomes, the court failed to actually determine the extent of any shortfall. Rather, it simply proceeded to reduce the parties' expenses to meet available resources without first establishing a baseline for determining whether the result was equitable in terms of the parties' marital living standard. *See Rayner v. Rayner*, 2013 UT App 269, ¶ 22, 316 P.3d 455 (explaining that an appellate court cannot review a decision if

the trial court's findings are "inadequate to explain its deviation from the general rules" applying to divorce proceedings).

¶26 Certainly, a court is not obligated to assess the parties' needs in light of the marital standard if evidence is not provided to allow the court to do so. *Compare Dahl v. Dahl*, 2015 UT 79, ¶¶ 108–12 (affirming the district court's decision not to award permanent alimony where the receiving spouse failed to provide credible evidence of her needs), *with Kidd v. Kidd*, 2014 UT App 26, ¶¶ 20–24, 321 P.3d 200 (affirming the district court's decision to accept the wife's projected needs rather than actual expenses in circumstances where the wife provided both in her financial declaration and the projected expenses comported with the standard of living she had grown accustomed to during the marriage). But as Richelle points out, her financial declaration included both her current expenses at the time of trial and expenditures that she claimed reflected the parties' standard of living during the marriage. *See Kidd*, 2014 UT App 26, ¶ 21 (noting that the wife appropriately included her actual expenses for rent at the time of trial, but also the expenses she would incur when she eventually acquired a home, where home ownership had been the marital standard). While Geoffrey did not include both his current and his marital standard for some expense categories, the majority of the expenses in his financial declaration are identical in amount to those identified as marital expenses in Richelle's financial declaration, implying that his expenses were based on a marital standard as well. Further, the court appears to have eliminated entire categories of expenses—those that "were voluntary, discretionary expenses or estimates," like retirement contributions—based upon its own determination that they were not necessary to the parties' present circumstances, not because there was no credible evidence to support those expenses as part of the marital living standard. Thus, lack of evidence does not appear to be a basis for the court's refusal to establish the marital living standard as the baseline for making its alimony determination.

¶27 The explanation the court gave for declining to determine the marital standard of living as part of the alimony determination was its conclusion that the parties' combined resources were insufficient to sustain the marital standard. But under our well-established precedent, that alone is not enough to justify bypassing the traditional needs analysis. Rather, the traditional needs analysis is designed to identify and determine the magnitude of any shortfall in resources. As we explained above, it is well settled that after determining that the receiving spouse has unmet needs in light of the historical living standard, the next step is to determine whether the payor spouse's resources are sufficient to cover the shortfall identified. And if that is not possible, the court must then equitably divide the burden of insufficient resources between the parties. *See Dobson v. Dobson*, 2012 UT App 373, ¶ 22, 294 P.3d 591 (laying out the process to be followed for making a traditional needs analysis and addressing the circumstances where equalization is proper); *Sellers v. Sellers*, 2010 UT App 393, ¶ 3, 246 P.3d 173 (explaining that income equalization is "better described as equalization of poverty," and a court should "equalize the incomes of the parties only in those situations in which one party does not earn enough to cover his or her demonstrated needs and the other party does not have the ability to pay enough to cover those needs" (internal quotation marks omitted)); *see also McPherson v. McPherson*, 2011 UT App 382, ¶¶ 15–16, 265 P.3d 839 (explaining that a court must provide adequate findings to justify disproportionately burdening one party with the shortfall). The equitable division of the shortfall begins with a determination of the marital living standard: "The purpose of equalization is to ensure that *when parties are unable to maintain the standard of living to which they were accustomed during marriage*, the shortfall is equitably shared." *Kidd*, 2014 UT App 26, ¶ 26 (emphasis added). In other words, our precedent has established that the shortfall that justifies an "equalization of income" determination relates to the difference between the parties' historical living standard and the parties' present combined ability to meet that standard. The parties' historical living standard is therefore a baseline for

determining that a shortfall exists at all as well as a necessary reference point in the determination of how to equitably allocate the shortfall.

¶28 We acknowledge that under Utah Code section 30-3-5(8)(e), trial courts do have some discretion to use the parties' living standard at the time of trial, as the court appears to have done here. Section 30-3-5(8)(e) sets forth the "general rule" that "the court should look to the standard of living, existing at the time of separation, in determining alimony," but it also provides that the court, through consideration of "all relevant facts and equitable principles," "may, in its discretion, base alimony on the standard of living that existed at the time of trial." Utah Code Ann. § 30-3-5(8)(e) (LexisNexis 2013). However, as we have explained above, the existence of a resource shortfall alone is not sufficient to justify a departure from the general rule, because our traditional needs analysis that begins with determination of the marital living standard has itself been designed to deal with the circumstance of insufficient resources. Rather, a departure from the general rule must be justified on some other basis. *See, e.g., Dahl*, 2015 UT 79, ¶¶ 110–12 (concluding that the district court did not abuse its discretion in declining to award the wife permanent alimony where she "fail[ed] to provide the court with any credible evidence regarding her financial need," which rendered it "impossible [for the district court] to determine the amount of alimony necessary to result in a standard of living at present that would approach the previous living condition"(internal quotation marks omitted)); *Howell v. Howell*, 806 P.2d 1209, 1212 (Utah Ct. App. 1991) (concluding that the trial court abused its discretion by determining the standard of living as of the time of separation rather than at the time of trial where the payor spouse's income doubled in the two years between the parties' separation and the trial, and his "ability to take advantage of that change was at least in part a result of having persevered during the lean times, as did his wife and children," and where the increased income was "akin to deferred income"); *see also Fish v. Fish*, 2010 UT App 292, ¶ 29, 242 P.3d

787 (concluding that even though "the court based its calculation of the parties' needs on their expenses at the time of trial," it was not an abuse of discretion to do so where it did not appear that "those expenses reflected a higher standard of living than the parties experienced during their marriage").[3]

---

3. Although some of its language might suggest otherwise, *Mullins v. Mullins*, 2016 UT App 77, 370 P.3d 1283, does not support a different result. In *Mullins*, the trial court determined it was appropriate to equalize the parties' standards of living because there was insufficient income to meet even the wife's minimum needs, and it awarded alimony to the wife accordingly. *Id.* ¶¶ 11–14. The husband argued on appeal that the trial court failed to make adequately detailed findings of fact regarding the wife's needs to support its alimony award. *Id.* ¶¶ 9, 11. In particular, he contended that the court had failed to assess the wife's needs according to the marital standard of living but instead on her needs at the time of trial. *Id.* ¶ 11. We upheld the trial court's alimony award. *Id.* ¶¶ 11–14. Unlike the present case, the trial court in *Mullins* considered all of the evidence the parties presented regarding the wife's needs, including evidence of the income available to her at the time of the parties' separation, a financial declaration filed before trial and additional testimony showing expenses of $3,900 a month, and her testimony that her minimum needs at the time of trial were $3,000 a month. *Id.* ¶¶ 13–14. The court considered and made findings attempting to harmonize all the needs evidence presented, and ultimately determined that though her established needs were significantly higher than the minimum expenses she testified to at trial, the parties' combined resources were inadequate to meet even that lower standard. *Id.* As a result, the court decided to equalize the parties' standards of living by awarding alimony to the wife in an amount that would result in each party bearing a comparable shortfall in income. *Id.* Though the trial court did not expressly determine a marital standard of living, it appears to have followed the process we

(continued…)

¶29 In awarding alimony, then, the district court departed from the requirements of the traditional needs analysis by failing to determine the parties' needs in light of the marital standard of living. As a consequence, even if its general conclusion that there was insufficient combined income to meet the marital standard was true, the court failed to establish the necessary baseline to anchor the balance of the equalization analysis. It is therefore not possible to reliably assess whether the court's attempt to deal with the burden of the parties' insufficient resources by cutting their expenses met the ultimate goal of equitable allocation of that burden between them. *See Kidd*, 2014 UT App 26, ¶ 26 (explaining that "[t]he purpose of equalization is to ensure that when parties are unable to maintain the standard of living to which they were accustomed during marriage, the shortfall is equitably shared"). Here, Richelle asked the court to determine her marital living standard and provided evidence that her actual expenses at the time of trial were not representative of the standard of living she had grown accustomed to during the marriage. For example, according to her financial declaration, at the time of trial Richelle was renting a home instead of owning one as was apparently typical during the marriage, and as a result her current expenses were reduced in several expense categories to reflect the lack of home ownership. And her circumstances after separation meant that she did not have income to spend on certain discretionary items, such as clothing or retirement contributions, that were apparently part of her

---

(…continued)

have described above. The court appropriately took into account all the evidence presented regarding the wife's needs, including evidence of her expenses and available income near the time of the parties' separation; determined that there was insufficient income, even were it to base alimony on the minimal needs the wife testified to at the time of trial; and then equalized the parties' shortfall in order to equitably allocate the burden of insufficient resources. *Id.*

lifestyle during the marriage. *See Woolums v. Woolums*, 2013 UT App 232, ¶ 9, 312 P.3d 939 (explaining that we have "disavowed the notion that 'standard of living is determined by actual expenses alone'" because "[a] party's current, actual expenses 'may be necessarily lower than needed to maintain an appropriate standard of living for various reasons, including, possibly, lack of income'" (quoting *Howell*, 806 P.2d at 1212)); *cf. Kidd*, 2014 UT App 26, ¶¶ 20–24 (affirming the trial court's decision in a shortfall case to base the wife's monthly expenses on projected expenses consistent with home ownership, even though at the time of trial the wife was living with a relative, because home ownership was the standard she had grown accustomed to during marriage).

¶30 Thus, the court's decision to bypass the marital standard and go straight to the parties' actual expenses at the time of trial resulted in Richelle's legitimate needs being significantly undervalued in terms of the marital living standard. Further, the court then made its own determination of what expenditures were reasonable given the circumstances at trial and did not consider whether the result was equitable given the parties' historical living standard. *See, e.g.*, *Dobson*, 2012 UT App 373, ¶ 29 (reversing the court's needs determination for the receiving spouse where "there [was] no indication in the record that the trial court analyzed [the receiving spouse's] claimed expenses in light of the marital standard of living"). Though a hard look at the parties' actual needs and resources at the time of trial is certainly an appropriate component of an alimony determination, it cannot be the only factor considered. *See Woolums*, 2013 UT App 232, ¶ 9 (explaining that we have "disavowed the notion that standard of living is determined by actual expenses alone" (citation and internal quotation marks omitted)). As a result, we cannot be confident that under the circumstances the court's alimony award is equitable or actually advances one of alimony's "chief functions"—"to permit [both] parties to maintain as much as possible the same standards after

the dissolution of the marriage as those enjoyed during the marriage." *See Savage v. Savage*, 658 P.2d 1201, 1205 (Utah 1983).

¶31    Moreover, the court's needs determination represents Richelle's maximum permissible alimony award, and, as she points out, the court's reduced needs determination may well impair her ability in the future to invoke the court's continuing jurisdiction to increase her alimony to a level commensurate with the marital standard, should Geoffrey's income—and commensurate ability to meet her needs—materially change in the future. *See generally Smith v. Smith*, 793 P.2d 407, 410 (Utah Ct. App. 1990) (explaining that the doctrine of res judicata "bars domestic modification proceedings only where the moving party cannot establish either a substantial change of circumstances or mistake of fact"). Such a change in circumstances is certainly possible in the context of a long-term alimony award, such as this one, given the seventeen-year length of the parties' marriage. And such a change is made more difficult to establish if the marital baseline is not established in the original alimony determination when evidence is fresher and more readily obtainable and verifiable.

¶32    For these reasons, we vacate the alimony award and remand for the court to reassess its alimony determinations in light of the marital standard of living and to accordingly make detailed findings of fact to support its ultimate award. This process should include the steps of the traditional analysis, which involve a determination of Richelle's needs based on the marital standard of living, her ability to meet those needs, and Geoffrey's ability to cover any unmet needs. In the event that Geoffrey's income is not sufficient to cover Richelle's unmet needs, the court should equitably divide the shortfall between the parties in light of their separate needs, based upon the appropriate standard of living and any other relevant circumstances. *Dobson v. Dobson*, 2012 UT App 373, ¶ 22, 294 P.3d 591. At that point, the court has discretion "to make whatever . . . adjustments it deems necessary to achieve an

equalization of the parties' standards of living" and otherwise determine how best to equitably divide the burden of insufficient income between the parties. *McPherson v. McPherson*, 2011 UT App 382, ¶ 16, 265 P.3d 839. For example, once a shortfall has been established, taking into account and making adjustments for what under the circumstances might be inflated, improper, or unreasonable expenses may be acceptable, so long as the considerations leading to the reductions are sufficiently explained in the court's findings and the overall result is equitable. *See id.*

## CONCLUSION

¶33    We vacate the district court's alimony award and remand for the district court to reassess its alimony award in accordance with this opinion.

————————