2020 UT App 34

## THE UTAH COURT OF APPEALS

PEGGY PETRZELKA,
Appellee,
*v.*
JAMES E. GOODWIN,
Appellant.

Opinion
No. 20180923-CA
Filed March 5, 2020

First District Court, Logan Department
The Honorable Thomas Willmore
No. 164100050

Ashley E. Bown, Attorney for Appellant

Tess A. Davis, Attorney for Appellee

JUDGE JILL M. POHLMAN authored this Opinion, in which
JUDGES MICHELE M. CHRISTIANSEN FORSTER and RYAN M. HARRIS
concurred.

POHLMAN, Judge:

¶1    Peggy Petrzelka and James E. Goodwin married in
September 2004, separated in February 2015, and divorced in
February 2018. Following a bench trial, the court entered
judgment on several issues, including alimony and the division
of the parties' retirement accounts. The court declined to award
Goodwin alimony, finding that he was capable of meeting his
own needs. The court also determined that the marital portion of
Petrzelka's retirement account would be valued as of March 1,
2015—the approximate date of the parties' separation. Goodwin
challenges both determinations, asserting that the court erred by
declining to award him alimony and by declining to value

Petrzelka's account as of the time of the divorce decree or trial. We affirm.

BACKGROUND

¶2    Petrzelka and Goodwin married in September 2004. At the time, Petrzelka was forty-two years old, while Goodwin was sixty-one. During the marriage, the parties lived in a home that Petrzelka had purchased before their union. Both parties also worked. Petrzelka continued in her established teaching career, and Goodwin held jobs related to rural community development and land conservancy. While married, the parties kept their finances separate. They shared in some "very limited" joint expenses, but otherwise maintained separate bank and credit card accounts and spent their respective incomes how they wished.

¶3    Goodwin retired in 2012, and the parties separated in February 2015. After their separation, Goodwin moved to California, while Petrzelka remained in Utah. At the conclusion of a two-day trial in February 2018, the parties were granted a divorce.

¶4    Following the trial, the court entered judgment on several issues, including Goodwin's claim for alimony and the division of the parties' retirement accounts. Based on its assessment of Goodwin's needs and his ability to meet them, the court declined to award alimony. It determined that Goodwin was able to meet his needs through a combination of his Social Security and retirement income, and income the court imputed to him at $15 per hour for twenty hours per week.

¶5    The court also determined that a portion of one of Petrzelka's retirement accounts would be subject to division as marital property. Rather than setting the end date of the

valuation period as the date of trial or the divorce decree as Goodwin requested, the court set the valuation period as September 4, 2004—the date of the parties' marriage—to March 1, 2015—the month immediately following the parties' separation.

ISSUES AND STANDARDS OF REVIEW

¶6      On appeal, Goodwin challenges the trial court's decision not to award alimony. In general, trial courts in divorce actions are "permitted considerable discretion in adjusting the financial and property interests of the parties." *Rayner v. Rayner*, 2013 UT App 269, ¶ 4, 316 P.3d 455 (cleaned up). "Accordingly, we will reverse only if (1) there was a misunderstanding or misapplication of the law resulting in substantial and prejudicial error; (2) the factual findings upon which the award was based are clearly erroneous; or (3) the party challenging the award shows that such a serious inequity has resulted as to manifest a clear abuse of discretion." *Gardner v. Gardner*, 2019 UT 61, ¶ 18, 452 P.3d 1134 (cleaned up). "Because we can properly find abuse only if no reasonable person would take the view adopted by the trial court, appellants have a heavy burden to show that an alleged error falls into any of these three categories." *Id.* (cleaned up).

¶7      Goodwin also challenges the trial court's division of Petrzelka's retirement account, arguing that the court erred in setting the end date of the valuation period as March 1, 2015, shortly after the parties' separation, rather than the date of trial or the divorce decree. "Generally, the marital estate is valued at the time of the divorce decree or trial." *Jacobsen v. Jacobsen*, 2011 UT App 161, ¶ 39, 257 P.3d 478 (cleaned up). However, as with alimony, the court has broad discretion to use a different date so long as its decision it supported by "sufficiently detailed findings of fact explaining its deviation

from the general rule." *Id.* (cleaned up); *see also Rayner*, 2013 UT App 269, ¶ 19 ("A trial court has broad discretion to deviate from [the] general rule when circumstances warrant." (cleaned up)).

ANALYSIS

I. Denial of Alimony

¶8      Goodwin argues that the trial court exceeded its discretion by declining to award alimony. Alimony awards are generally aimed at "enabling the receiving spouse to maintain, as nearly as possible, the standard of living enjoyed during the marriage, and preventing the receiving spouse from becoming a public charge." *Anderson v. Anderson*, 2018 UT App 19, ¶ 29, 414 P.3d 1069 (cleaned up); *Rule v. Rule*, 2017 UT App 137, ¶ 14, 402 P.3d 153.

¶9      To that end, in deciding whether to award alimony, a court must consider several factors relevant to alimony's purposes, including the "financial condition and needs of the recipient spouse," "the recipient's earning capacity or ability to produce income," and "the ability of the payor spouse to provide support." Utah Code Ann. § 30-3-5(8)(a)(i)–(iii) (LexisNexis 2019); *see also Jones v. Jones*, 700 P.2d 1072, 1075 (Utah 1985) (same); *Barrani v. Barrani*, 2014 UT App 204, ¶ 21, 334 P.3d 994 (same). In assessing the parties' needs and their respective abilities to fulfill those needs, courts should generally look to the marital standard of living. *See Rule*, 2017 UT App 137, ¶ 15; *see also* Utah Code Ann. § 30-3-5(8)(e) (instructing courts to, as a general rule, "look to the standard of living, existing at the time of separation," in setting alimony awards). If a court determines that the spouse requesting alimony is able to meet his or her own needs, the court "should not award alimony." *Dobson v. Dobson*, 2012 UT App 373, ¶ 22, 294 P.3d 591.

¶10    Further, courts in divorce cases may consider imputing income to an unemployed spouse in assessing the spouse's ability to produce income. *See Gardner v. Gardner*, 2019 UT 61, ¶ 98, 452 P.3d 1134; *Leppert v. Leppert*, 2009 UT App 10, ¶ 12, 200 P.3d 223; *see also* Utah Code Ann. § 78B-12-203(8)(b) (LexisNexis 2018) (setting out the considerations for imputing income to a parent for child support).[1] All else being equal, a spouse who is capable of working ought to be "accountable for meeting [his or] her own needs to the extent" of that capability. *Hansen v. Hansen*, 2014 UT App 96, ¶ 9, 325 P.3d 864 (explaining that imputing income to a spouse "holds [that spouse] accountable for meeting her own needs to the extent she is capable").

A.    The Court's Alimony Findings

¶11    Here, the court determined that, in light of the facts, circumstances, and equities at play, Goodwin was capable of meeting his own needs. It therefore declined to award alimony. To that end, the court made extensive findings with respect to both the facts it found relevant to the overall question of alimony and the statutory factors described in Utah Code section 30-3-5.

¶12    The court found relevant the fact that the marriage was "entered into later in life for both parties," and it considered the parties' respective situations before, and contributions to, the marriage. For example, the court found that Goodwin "did not give up anything by entering into the marriage" and brought no "assets or real income into the marriage." With respect to Petrzelka, the court found that she brought "an established and successful teaching career into the marriage" and that there was

---

1. "Although this section of the Utah Code addresses imputation for the purposes of child support, it is also relevant to imputation in the alimony context." *Hartvigsen v. Hartvigsen*, 2018 UT App 238, ¶ 8 n.5, 437 P.3d 1257 (cleaned up).

"no evidence that [Goodwin] did anything to improve [Petrzelka's] income or her education or her earning capacity."

¶13 The court also determined that the "most significant factor" in its alimony calculus was the parties' agreement to share only a few joint living expenses during the marriage. The court found that during the marriage "the parties agreed to equally pay certain limited joint living expenses" and that those shared expenses were "very, very limited." In this respect, the court noted and "place[d] great weight on the fact that the parties essentially maintained separate standards of living," where each party kept "separate accounts and expenses during the marriage," which accordingly "allowed each party to spend their respective income how they wished."

¶14 Regarding their separate living standards, the court also found "very persuasive" that Goodwin had "always lived beyond his means with his separate credit cards," noting that he entered the marriage with a credit card balance and that he continued to carry one "after the date of separation due to his continual over-spending." The court found such facts as "strong evidence of the parties' standard of living during the marriage and especially [Goodwin's] standard of living."

¶15 As to Goodwin's needs, the court accepted his stated monthly expenses of $3,349, finding them, "for the most part, reasonable," though noting that his cable TV expenses, food budget, and credit card bills were "too high."

¶16 With regard to Goodwin's ability to meet his needs, the court found that Goodwin had a gross income of $3,571 per month. It reached this figure by adding Goodwin's Social Security and retirement income, which it found was $2,271 per month, and imputing to Goodwin additional income of $1,300 per month based on a finding that Goodwin could work part-time (i.e., twenty hours per week) at $15 per hour.

The court's imputation determination was based on several findings about Goodwin's ability to produce income. For example, the court found that Goodwin had "very marketable" and "extensive job skills," given his background and work history, and that "nothing . . . limits him from doing some sort of work." In this respect, the court noted evidence showing that Goodwin remained somewhat active in his retirement—that he was able to travel, walk and hike with dogs, carry his grandchildren, babysit, and volunteer. The court additionally found that Goodwin would receive a "considerable sum from [Petrzelka's] retirement account, which he did not contribute to or cause in any way to increase," and that "such funds can be used for his support and for the payment of his debts."

¶17   The court also accepted Petrzelka's assertion that there is no right to retire, stating that there is no "legal right to quit supporting oneself in a divorce situation such as this." And the court found that, under the circumstances, it was "not equitable for [Goodwin] to choose not to work or take any action to support himself." The court then ultimately concluded, "[b]ased on the foregoing facts, circumstances and equitable principles," that Goodwin was "capable of meeting his own needs" and that therefore no alimony would be awarded.

B.      Goodwin's Challenges to the Court's Alimony Decision

¶18   In challenging the court's denial of alimony, Goodwin suggests that the court's evaluation of the relevant alimony factors was not proper, most significantly its decision to impute income to him. He also raises various challenges to some of the court's alimony findings. Because the court's decision to impute income to Goodwin plays a significant role in its overall decision not to award alimony, we first address Goodwin's challenges to that decision. We then address Goodwin's remaining challenges.

1.      Imputation of Income

¶19     Goodwin argues, relying heavily on the fact of his retirement before the parties' separation, that the trial court exceeded its discretion by imputing income to him. As discussed above, the court had "considerable discretion" to adjust Petrzelka's and Goodwin's financial interests, and its "actions are entitled to a presumption of validity." *Gardner v. Gardner*, 2019 UT 61, ¶ 18, 452 P.3d 1134 (cleaned up). Accordingly, to prevail on his challenge to the court's imputation decision, Goodwin must demonstrate that the court misunderstood or misapplied our alimony laws, that the factual findings supporting its decision were clearly erroneous, or that the imputation has resulted in "such a serious inequity" so as to "manifest a clear abuse of discretion." *Id.* (cleaned up).

¶20     Goodwin does not suggest that the court's decision to impute income to him arose from a misapplication or misunderstanding of the law; indeed, while the fact of his retirement is central to his imputation challenge, he concedes that there is no statutory right to retire in Utah. Instead, he suggests that the court's decision to impute income to him results in a serious inequity. He also challenges the evidentiary basis for the court's decision to impute income to him at the amount of $15 per hour. We address each argument below.

a.      The Decision to Impute Income

¶21     As previously discussed, a court may consider imputing income to an unemployed spouse in evaluating a request for alimony. *See Gardner*, 2019 UT 61, ¶ 98; *Leppert v. Leppert*, 2009 UT App 10, ¶ 12, 200 P.3d 223. Utah Code section 78B-12-203 addresses imputation of income and provides that such imputation "shall be based upon employment potential and probable earnings" in tandem with consideration of a variety of factors, to the extent they are known, such as

"employment opportunities," "work history," "age," "health," "other employment barriers and background factors," and "prevailing earnings and job availability for persons of similar backgrounds in the community." Utah Code Ann. § 78B-12-203(8)(b) (LexisNexis 2018).

¶22 Here, the court's findings indicate that, despite Goodwin's age and the fact of his retirement, the court was persuaded that the overall facts, circumstances, and equities surrounding the question of alimony supported the decision to impute income to him. Goodwin has not demonstrated that, given the whole host of considerations at play, this decision resulted in a serious inequity.

¶23 To begin with, the court found that Goodwin was capable of "some sort of work." During the parties' marriage, Goodwin had worked and had been able to produce income at a rate of over $50,000 per year—well exceeding the income the court imputed at $15 per hour on a part-time basis. The court also found that Goodwin had "very marketable skills" in light of his "background and work history," which the evidence at trial suggested included experience in various employment sectors such as the Air Force, the solar power industry, pesticide sales, real estate, rural community development, land conservancy, and the financial industry. And in terms of his physical capabilities, the court found that, post-retirement, Goodwin had demonstrated an ability to pursue various activities, such as traveling, volunteering, walking and hiking with dogs, and interacting with and babysitting his grandchildren. Goodwin does not challenge these findings.

¶24 The court further found that the circumstances at play made it inequitable for Goodwin not to expend some effort to support himself. This was a later-in-life marriage for both parties, and the court found that the parties' contributions to it at the outset differed. Petrzelka brought an established career, and

the parties lived in the home she had purchased before the marriage. In contrast, Goodwin brought no "assets or real income" with him into the marriage, and the court found that there was no evidence that Goodwin "did anything to improve" Petrzelka's income, education, or earning capacity.[2]

¶25 Most importantly, central to the court's overall alimony decision was its determination that, for all intents and purposes, the parties lived separate financial lives during the marriage, with the result that the parties "essentially maintained separate standards of living." While the parties may have contributed to certain shared monthly expenses, the court found that those shared expenses were "very, very limited" and were only ones to which both parties agreed. Significantly, the court also noted that Goodwin had consistently lived beyond his means, "with his separate credit cards," before and during the marriage, as

---

2. Goodwin briefly challenges the court's findings with respect to his contributions to the marriage by characterizing them as findings that he "gave up nothing and brought nothing to this marriage" and by contending that such findings were "pure speculation." However, Goodwin supports this argument by pointing to evidence that supports only his own position. He does not identify or address the evidence that might support the court's findings on these points. To properly challenge the court's findings, Goodwin must demonstrate that they do not follow logically from the evidence, or, stated another way, that they are against the clear weight of it. *See Gardner v. Gardner*, 2019 UT 61, ¶ 32, 452 P.3d 1134; *Taft v. Taft*, 2016 UT App 135, ¶ 16, 379 P.3d 890 ("A trial court's factual determinations are clearly erroneous only if they are in conflict with the clear weight of the evidence, or if [this] court has a definite and firm conviction that a mistake has been made." (cleaned up)). Goodwin has not met that burden.

well as after the parties' separation. Goodwin has not challenged these findings.

¶26 Given the full picture of the considerations and circumstances surrounding the court's decision to impute income, we cannot say that imputing income to Goodwin on a part-time basis exceeded the bounds of the court's broad discretion. Goodwin suggests his retirement during the parties' marriage should have precluded the court from imputing income to him, but he has not demonstrated that this premise is at all sound. Because income imputation itself is primarily focused on a spouse's *ability* to produce income, it is not unusual for courts to impute income to a spouse who has not worked during the marriage (or who has not worked for a number of years preceding the divorce) but who is nevertheless *capable* of producing income. *E.g.*, *Hartvigsen v. Hartvigsen*, 2018 UT App 238, ¶¶ 6–22, 437 P.3d 1257 (affirming the trial court's imputation of income, despite the fact that the spouse had not earned such an income for nineteen years, where the evidence showed she was capable of doing so); *Hansen v. Hansen*, 2014 UT App 96, ¶¶ 2–3, 8–9, 15 & n.4, 325 P.3d 864 (imputing income at minimum wage to a nonworking spouse, and "in spite of her advancing age," even where, at the time of the divorce, the parties were living on retirement benefits); *Leppert*, 2009 UT App 10, ¶¶ 11–12 (affirming the imputation of income to a recipient spouse who had not worked for more than two decades where the court found that she was "capable of generating employment income at the minimum wage level").

¶27 Thus, in the unique circumstances surrounding the parties' marriage, and pursuant to the numerous unchallenged findings with respect to Goodwin's ability to produce income and the equities in play, the court's decision to impute income to Goodwin on a part-time basis at twenty hours a week did not result in "such a serious inequity" so as to "manifest a clear abuse of discretion." *See Gardner*, 2019 UT 61, ¶ 18 (cleaned up).

b.      Imputing Income at $15 per Hour

¶28    Goodwin also challenges the evidentiary support for the court's decision to impute income to him at a rate of $15 per hour. He claims that figure was based on a finding that $15 per hour was California's minimum wage. He asserts that the wage was suggested by Petrzelka only during closing argument and that there was no evidence introduced at trial to support it.

¶29    We do not agree with Goodwin's characterization of the court's findings. During its oral ruling, when asked by Goodwin's counsel what the basis was for its decision to impute income at $15 per hour, the court initially responded that the minimum wage in "California is at $15 or right close to $15 per hour." But when pressed by Goodwin's counsel about whether the court would reconsider if that figure was not correct, the court stated that, "even if that is not minimum wage [in California], [Goodwin] could go out and find a $15 per hour [job] with his background and his ability to work." The court's later written findings of fact and conclusions of law reflect this reasoning; the court did not find that $15 was California's minimum wage or suggest that its decision to impute that figure was so based. Rather, the court relied entirely on its determination that Goodwin's "extensive job skills, training and work history allows him to find work earning at least $15 per hour."[3]

---

3. Following the court's oral ruling, Goodwin objected to the proposed findings of fact and conclusions of law on several grounds, one of them being the proposed basis of the court's decision to impute income at $15 per hour. The proposed findings of fact, like the final written findings, made no mention of California's minimum wage. In his objections, Goodwin argued that language should be added to reflect a further

(continued…)

¶30   By narrowing his challenge to the evidence (or lack thereof) supporting the proposition that California's minimum wage is $15 per hour, Goodwin has made no attempt to deal with the stated basis for the court's finding, as evidenced by its written findings. *See generally M.F. v. J.F.*, 2013 UT App 247, ¶ 6, 312 P.3d 946 ("Our case law is clear that where a court's oral ruling differs from a final written order, the latter controls."). *See also Living Rivers v. Executive Dir. of the Utah Dep't of Envtl. Quality*, 2017 UT 64, ¶¶ 36–51, 417 P.3d 57 (declining to reach the merits of the appeal where the petitioner "utterly fail[ed] to engage with the substance of the [lower tribunal's] ruling"); *Duchesne Land, LC v. Division of Consumer Prot.*, 2011 UT App 153, ¶ 8, 257 P.3d 441 ("Because [the appellants] have not addressed the actual basis for the district court's ruling, they have failed to persuade us that the district court's ruling constituted error . . . ."). Nor has Goodwin identified or dealt with the evidence supporting the court's finding that his "job skills, training and work history" would allow him to find work at that amount per hour. Accordingly, Goodwin cannot persuade us that the court's decision to impute income at that amount is against the clear weight of the evidence, and his challenge fails. *See Taft v. Taft*, 2016 UT App 135, ¶ 19, 379 P.3d 890.

¶31   In short, we affirm the court's decision to impute income to Goodwin at $15 per hour on a part-time basis. Goodwin has not demonstrated that the court's decision to impute results in a serious inequity. He has also not adequately challenged the

_____

(…continued)
finding by the court that "California's minimum wage" is $15 per hour "or close thereto." He suggested that such language was necessary because it "was the Court's actual finding about why $15 per hour was being imputed" to him. By declining to include such language in its findings of fact, the court necessarily rejected Goodwin's position.

evidentiary basis supporting the decision to impute income in the amount of $15 per hour.

### 2.     The Remaining Challenges to the Alimony Denial

¶32     Because we have affirmed the trial court's decision to impute income as well as the hourly rate at which it did so, to persuade us that reversal is appropriate on the issue of alimony Goodwin must raise supportable challenges to other aspects of the court's decision to deny alimony. Goodwin raises several distinct challenges to the court's overall alimony denial, but none are ultimately persuasive.

#### a.     Consequences of Imputing Income

¶33     First, Goodwin claims that the alimony denial is improper, even if the imputation decision is affirmed, because the court erred in dealing with the consequences attendant to imputing income to him. He claims that the court failed to properly account for the tax consequences of the imputed income, where it used his gross rather than net imputed income to calculate his ability to meet his needs. And he claims that the court should have increased his monthly expenses to reflect the costs of returning to the workforce, such as car-related costs, "increased food costs for eating outside the home, increased clothing costs, and increased health expenses."

¶34     The tax issue is not properly before us. "A party seeking appellate review must provide a citation to the record showing that the issue was preserved in the trial court or a statement of grounds for seeking review of an issue not preserved in the trial court." *Shuman v. Shuman*, 2017 UT App 192, ¶ 28, 406 P.3d 258 (cleaned up); *Gowe v. Intermountain Healthcare, Inc.*, 2015 UT App 105, ¶ 7, 356 P.3d 683 ("We generally do not address unpreserved arguments raised for the first time on appeal. To preserve an argument for appellate review, the appellant must

first present the argument to the district court in such a way that the court has an opportunity to rule on it." (cleaned up)); *see also* Utah R. App. P. 24(a)(5)(B). Goodwin fails to demonstrate where in the record he preserved the request that the court impute net rather than gross income to him.[4] And based on our review of the record, we have found no request by Goodwin that the court consider the tax consequences of the imputed income. Thus, this issue has not been properly preserved for appeal.[5]

¶35   Moreover, even had Goodwin properly preserved the tax issue, he fails to demonstrate that this potential error affected the court's alimony determination. Instead, he simply suggests that the court import the tax rate applicable to Petrzelka—someone employed full-time as a teacher, who is not retired and not receiving Social Security benefits as income—rather than explaining "what the actual tax consequences of the court's error are or what they would have been had the court considered the tax implications" of his imputed income. *See Gardner*, 2019 UT 61, ¶ 105.

¶36   Similarly, Goodwin fails to carry his burden of persuasion with respect to the increased expenses related to working. While he argues that the court should have increased his expenses in various categories, at trial he did not present evidence of amounts to be added to give the court an evidentiary basis to do

---

4. Instead, in his objections to the proposed findings of fact and conclusions of law, Goodwin specifically asked the court to "include the word 'gross' in describing the amount of income the Court is imputing to [him]."

5. Ordinarily, parties' respective tax obligations ought to be taken into consideration in making an alimony determination. *See McPherson v. McPherson*, 2011 UT App 382, ¶¶ 13–16, 265 P.3d 839.

so. Likewise, on appeal, he fails to suggest any amount to be added for the various expenses or otherwise demonstrate how such increases might have affected the trial court's overall alimony determination. *See Pulham v. Kirsling*, 2019 UT 18, ¶¶ 33–39, 443 P.3d 1217 (declining to reverse for a new trial on the issue of monthly income where the appellant had not demonstrated that, even if the court erred in its income finding, the error was harmful).

¶37    Thus, Goodwin has not shown that reversal is warranted on either point.

b.    Marital Standard of Living Finding

¶38    Next, Goodwin disagrees with the court's assessment of the effect the parties' separate standards of living during the marriage ought to have on the question of alimony. He contends that if the parties indeed had separate standards of living as the court found, then, based on Petrzelka's contributions to some of his living expenses during the marriage, the "only conclusion for the trial court to make is that [he] was and is still in need of alimony."

¶39    However, alimony determinations are not made by rote, where there may be only one right conclusion. Instead, they are made in light of the range of unique circumstances in play. A trial court accordingly has considerable discretion in adjusting the parties' financial and property interests post-divorce, and its adjustments to those interests are entitled to a presumption of validity. *See* Utah Code Ann. § 30-3-5(8)(a) (LexisNexis 2019) (setting forth a list of factors courts must consider in determining alimony); *Gardner*, 2019 UT 61, ¶ 18. To persuade us that reversal is appropriate, Goodwin must demonstrate something more than mere disagreement with the court's evaluation of the evidence. *See Gardner*, 2019 UT 61, ¶ 18; *Taft*, 2016 UT App 135, ¶ 19.

¶40    And in suggesting that he should have been awarded alimony based on Petrzelka's contributions to the few monthly expenses shared during the marriage, Goodwin fails to engage with the court's reasoning or findings on their own terms or adequately account for the evidence supporting the decision not to award alimony. Among other things, he does not acknowledge the numerous findings that the evidence, as the court found it, suggested that Goodwin was capable of meeting his needs through his own income and that the parties' deliberate separation of their finances during marriage was germane to the equities surrounding the alimony request. *See Duchesne Land*, 2011 UT App 153, ¶ 8; *see also Rule v. Rule*, 2017 UT App 137, ¶ 19, 402 P.3d 153 ("If the court determines that the receiving spouse is able to meet all her needs with her own income, then it should not award alimony." (cleaned up)). Instead, Goodwin merely points to evidence he believes supports his position that the only appropriate conclusion was that he was in need of alimony at least in the minimum amount Petrzelka contributed to the parties' joint expenses during the marriage. He cannot persuade us that reversal is appropriate on such a showing. *See Taft*, 2016 UT App 135, ¶ 19.

c.    Material Omissions in the Findings

¶41    Finally, Goodwin claims that the court failed to make findings on certain "material" issues related to the alimony determination and that we should reverse on that basis. He contends that the court failed to account for $68.50 in monthly funeral costs and bank fees, which were not in his financial declaration but to which he testified. He also argues that "[t]here is no clear basis to determine what amount the trial court had in mind for [his] cable tv expenses, food expenses, and the credit card monthly payments," where the court found that they were too high but made no specific findings on those expenses.

¶42 Even assuming there is merit to Goodwin's complaints on these points, Goodwin must demonstrate that there is a "reasonable likelihood" that the omissions and errors he identifies affected (or, if in error, would affect) the court's alimony denial. *See Pulham*, 2019 UT 18, ¶¶ 33–39 (declining to reverse for a new trial on the issue of monthly income where the appellant had not demonstrated that, even if the court erred in its income finding, the error was harmful); *see also Gardner*, 2019 UT 61, ¶ 103 (concluding that the appellant failed to meet her burden on appeal where she made no attempt to show that the court's error resulted in harm). *See generally* Utah R. Civ. P. 61 ("The court at every stage of the proceeding must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties."). In arguing that the court's decision ought to be reversed for failure to make findings on this handful of expenses, Goodwin does not address all the reasons why alimony was denied or whether the court would have made a different decision had it considered the additional issues.

¶43 As discussed above, the court's ultimate decision to deny alimony was based on more than mathematics. The court sought to reach what it considered to be an appropriate alimony determination in light of all the "facts, circumstances and equitable principles" uniquely at play. Thus, the court's decision to deny alimony took into consideration more than simply the numbers the parties attached to their respective expenses and incomes. And because this is so, to persuade us that reversal is appropriate, Goodwin must demonstrate that even if the court's omissions were in error, it is reasonably likely that the court would not have denied alimony in light of all the relevant facts, circumstances, and equities. *See Pulham*, 2019 UT 18, ¶¶ 33–39. Goodwin does not attempt to make any such showing.

¶44 Further, even on the numbers alone, we question whether Goodwin could demonstrate harm. If the court were to enter additional findings on Goodwin's cable TV, food, and credit card

expenses, the amount of Goodwin's expenses would presumably decrease since the court found that those expenses were "too high." And given that the court determined that Goodwin's income—$3,571 per month—already exceeded the entirety of the expenses he claimed—$3,349 per month—we find it difficult to conclude that adding an additional $68.50 to his expenses would likely tip the balance in favor of an alimony award, particularly where other equities factored into the court's decision. Accordingly, he has not demonstrated that, even assuming it was error not to make additional findings on the expenses to which he points, the error was harmful to him. Goodwin is therefore not entitled to reversal on this issue.

¶45    In sum, we conclude that Goodwin has not shown that the court exceeded its discretion in either its decision to impute income to him or in its overall decision to deny alimony. We therefore affirm the court's denial of alimony.

## II. Retirement Division

¶46    Goodwin argues that the trial court erred by valuing the marital retirement assets as of March 1, 2015 (following the parties' separation), rather than the time of the divorce decree or trial in 2018. He claims that the circumstances in this case "did not warrant deviating from the standard of valuing the marital estate at the time of the divorce decree or trial." He also generally contends that this decision was inequitable.

¶47    While a court should generally value the marital estate "at the time of the divorce decree or trial," a court has broad discretion to value the parties' marital assets at a different time, such as that of separation, if it determines that the circumstances so warrant. *Rayner v. Rayner*, 2013 UT App 269, ¶ 19, 316 P.3d 455 (cleaned up); *see also Jacobsen v. Jacobsen*, 2011 UT App 161, ¶ 39, 257 P.3d 478.

¶48   Here, the court had a reasoned basis for concluding that circumstances warranted deviation from the general rule. The court found that, around the time the parties separated in February 2015, Petrzelka "stopped personally contributing to her retirement account" but that "she maintained such account and it continued to grow." As to Goodwin, the court found that "once [the parties] separated," Goodwin "continued to overspend and live beyond his means" and "started dissipating his retirement accounts, rather than maintaining those." For these reasons, the court determined that it would be "inequitable to use a later date," and therefore determined that the marital period for valuing both parties' retirement accounts would be from the date of the marriage in September 2004 to March 1, 2015.

¶49   Goodwin has not shown that the court's decision to value the parties' retirement accounts as of March 1, 2015, was inequitable or otherwise exceeded the court's broad discretion. The trial court's choice of March 1 as the relevant valuation date was thoughtfully made based on the parties' respective treatment of their retirement accounts at the time of separation. Specifically, Petrzelka stopped contributing to her account, while Goodwin began drawing from his accounts to supplement his income. March 1, 2015, therefore fairly represents the approximate date that both parties' treatment of their retirement accounts, in light of their separation, changed. In these circumstances, we cannot say that the trial court's decision was inequitable or that it otherwise exceeded its broad discretion in deviating from the general rule. *See Rayner*, 2013 UT App 269, ¶ 19; *Jacobsen*, 2011 UT App 161, ¶ 39.

### III. Attorney Fees

¶50   Both parties request attorney fees on appeal. Goodwin asks for fees because he was awarded them below. Petrzelka asks for her attorney fees on appeal, invoking rule 33 of the Utah

Rules of Appellate Procedure and this court's "inherent equitable power" to award fees "in the interest of justice and equity."

¶51 As a general rule, a prevailing party on appeal who was awarded attorney fees below will also be awarded their appellate fees. *See Stonehocker v. Stonehocker*, 2008 UT App 11, ¶ 52, 176 P.3d 476. Because Goodwin has not prevailed on appeal, we decline to award him his fees.

¶52 As for Petrzelka's request, because she was not awarded attorney fees below, she is not entitled to fees simply by virtue of prevailing on appeal. *See id.* And while attorney fees under rule 33 of the Utah Rules of Appellate Procedure may be awarded if a reviewing court determines that the appeal "is either frivolous or for delay," Utah R. App. P. 33(a), "the imposition of such a sanction is only to be used in egregious cases," *Pyper v. Reil*, 2018 UT App 200, ¶ 28 n.3, 437 P.3d 493 (cleaned up). We conclude that this is not such a case. For similar reasons, we are not inclined to otherwise exercise our equitable powers to award fees. We therefore decline Petrzelka's request for attorney fees.

CONCLUSION

¶53 We affirm. Goodwin has not demonstrated that the trial court exceeded its discretion by imputing income to him at its chosen hourly rate or by determining that alimony was not warranted under the circumstances. Goodwin also has not demonstrated that the court's decision to value the parties' retirement accounts as of March 1, 2015, was inequitable or constituted an abuse of discretion. Finally, we decline to award either party their attorney fees.

_____